912 A.2d 104

DELTA FUNDING CORPORATION, PLAINTIFF–RESPONDENT,
v. ALBERTA HARRIS, DEFENDANT–APPELLANT.

Argued February 14, 2006—Decided August 9, 2006.

*Madeline L. Houston* argued the cause for appellant (*Houston & Totaro*, attorneys).

*Martin C. Bryce, Jr.* argued the cause for respondent (*Ballard Spahr Andrews & Ingersoll,* attorneys).

*Baher Z. Azmy* argued the cause for *amici curiae* American Civil Liberties Union of New Jersey, The New Jersey Institute for Social Justice, New Jersey Citizen Action, The New Jersey Public Policy Research Institute, The National Association of Consumer Advocates, AARP, The Center for Responsible Lending, and Seton Hall School of Law Center for Social Justice (*Mr. Azmy,* Seton Hall University School of Law Center for Social Justice Civil Litigation Clinic, attorney; *Mr. Azmy* and *Jessica Yager, Joseph Faulkner* and *Melissa Kelly,* on the brief).

*Henry P. Wolfe* argued the cause for *amicus curiae* Legal Services of New Jersey (*Melville D. Miller, Jr.,* President, attorney; *Mr. Wolfe, Mr. Miller, David G. McMillin, Marcia E. Suarez, Marcie B. Harrison, Kristin A. Mateo, Carrie Ferraro* and *Dawn K. Miller,* on the brief).

*Jeffrey C. Burstein,* Assistant Attorney General, argued the cause for *amici curiae* Attorney General of New Jersey and The New Jersey Division of Consumer Affairs (*Zulima V. Farber,* Attorney General, attorney; *Mr. Burstein* and *Carol G. Jacobson,* on the brief).

*David M. Gossett,* a member of the Illinois and District of Columbia bars, argued the cause for *amicus curiae* Chamber of Commerce of the United States of America (*Drinker Biddle & Reath,* attorneys; *Mr. Gossett, Evan M. Tager,* a member of the New York and District of Columbia bars, *Robin S. Conrad,* a member of the District of Columbia bar, *Amar D. Sarwal,* a member of the District of Columbia bar, of counsel; *Andrew B. Joseph,* on the brief).

*Mark L. Rienzi, Christopher Lipsett,* a member of District of Columbia and New York bars, *Eric J. Mogilnicki,* a member of District of Columbia and Massachusetts bars and *Kelly Thompson Cochran,* a member of the District of Columbia and Virginia bars, submitted a brief on behalf of *amicus curiae* American Financial Services Association (*Mr.Rienzi,* attorney).

*Marvin J. Brauth* and *Jeffrey J. Brookner* submitted a brief on behalf of *amicus curiae* New Jersey Business and Industry Association (*Wilentz, Goldman & Spitzer,* attorneys; *Mr. Brauth,* of counsel; *Mr. Brauth* and *Mr. Brookner,* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

This matter presents a question of law certified and submitted by the United States Court of Appeals for the Third Circuit pursuant to the procedures set forth in *Rule* 2:12A. We have been asked whether an arbitration agreement found in a consumer loan contract is unconscionable, in whole or in part, under New Jersey contract law. Because many of the agreement's provisions are ambiguous, interpretation of the contract by an arbitrator is necessary before there can be a final resolution of this dispute. However, to the extent that the procedural posture of this matter permits, we hold that several parts of the arbitration agreement may be unenforceable based on unconscionability doctrine if interpreted by an arbitrator unfavorably to the consumer as described herein.

## I.

We begin with the facts as presented by the federal court, although we acknowledge the presence of factual disputes between the parties. *R.* 2:12A–4. The purpose of the certification process is to answer the question of law submitted pursuant to *Rule* 2:12A, not to resolve those factual differences. *See R.* 2:12A–1.

Plaintiff Delta Funding Corp. (Delta) is a New York mortgage lender that extends loans primarily to borrowers in the sub-prime lending market. In December 1999, Delta entered into a mortgage loan contract with defendant Alberta Harris, a seventy-eight-year-old woman with only a sixth-grade education and little financial sophistication. The $37,700 loan was secured by a mortgage on Harris's home in Newark.[1] The loan had an annual percentage

---

[1] Harris and the amici who support her in this matter contend that there was substantial procedural unconscionability in this contract's formation. They

rate of fourteen percent. At the time, Harris owned her home outright and had lived in it for more than thirty years. Delta subsequently assigned the loan to Wells Fargo as trustee.

The loan contains an arbitration agreement that allows either party to elect binding arbitration as the forum to resolve covered claims. The agreement excludes from arbitration "any action to effect a judicial or non-judicial foreclosure or to establish a deficiency judgment," as well as a number of similar actions. The agreement provides that "[t]here shall be no right or authority for any Claims to be arbitrated on a class action or class-wide basis." In respect of costs, the agreement further provides that

> [a]t your written request, we will consider in good faith making a temporary advance of all or part of the filing, administrative and/or hearing fees in connection with any Claim you initiate as to which you or we seek arbitration. At the conclusion of the arbitration, the arbitrator will decide who will ultimately be responsible for paying the filing, administrative and/or hearing fees in connection with the arbitration. Unless inconsistent with applicable law, each party shall bear the expense of that party's attorneys', experts' and witness fees, regardless of which party prevails in the arbitration.

The agreement also provides for an appeal procedure within arbitration and states that "[t]he costs of ... [any such] appeal will be borne by the appealing party regardless of the outcome of the appeal."

Under the agreement, Harris is permitted to select the American Arbitration Association (AAA), J.A.M.S./Endispute (JAMS), or the National Arbitration Forum (NAF) as the forum for any claim. The agreement also contains a severability clause, which states that "[i]f any portion of this Agreement is deemed invalid or unenforceable under any law or statute consistent with the [Federal Arbitration Act], it shall not invalidate the remaining portions of this Agreement or the Credit Transaction, each of which shall be enforceable regardless of such invalidity."

---

assert that Harris was presented with the arbitration agreement as part of many pages of mortgage documents that were brought to her home for signature at ten o'clock one evening. We do not attempt to resolve this or other factual disputes between the parties.

When Harris, whose only source of income was Social Security payments, was unable to make the required loan payments, Wells Fargo instituted a mortgage foreclosure action in New Jersey Superior Court. Harris responded with an answer and counterclaim, as well as a third-party complaint against Delta, alleging violations of the Truth in Lending Act (TILA), 15 *U.S.C.A.* §§ 1601 to –67, the Real Estate Settlement Procedures Act (RESPA), 12 *U.S.C.A.* §§ 2601 to –17, and the New Jersey Consumer Fraud Act (CFA), *N.J.S.A.* 56:8–1 to –135. Thereafter, Delta filed a petition in federal district court seeking to compel arbitration of Harris's affirmative claims against Delta. Harris filed a motion for summary judgment contending that the arbitration agreement was unconscionable and unenforceable. In March 2004, the district court denied that motion for summary judgment and granted Delta's motion to compel arbitration. *Delta Funding Corp. v. Harris,* 396 *F.Supp.*2d 512 (D.N.J.2004). The state court presiding over the foreclosure action then dismissed Harris's third-party complaint against Delta, which had been held in abeyance.

Harris appealed to the United States Court of Appeals for the Third Circuit. A three-judge panel of the Third Circuit issued a petition order to this Court pursuant to *Rule* 2:12A–3, in which the panel certified the question: "Is the arbitration agreement at issue in this case, or any provision thereof, unconscionable under New Jersey law, *N.J. Stat. Ann.* § 12A:2–302, and if so, should such provision or provisions be severed." *Delta Funding Corp. v. Harris,* 426 *F.*3d 671, 675 (3d Cir.2005). Harris submitted a brief urging that we grant certification, but asking that we remove the reference to *N.J.S.A.* 12A:2–302 because her unconscionability claim is based on the common law. *See R.* 2:12A–2.

We granted certification, reformulating the question as follows: "Is the arbitration agreement at issue, or any provision thereof, unconscionable under New Jersey law, and, if so, should such provision or provisions be severed?" 185 *N.J.* 255, 883 *A.*2d 1055 (2005). Briefs were received from the parties; in addition, numerous groups filed submissions as friends of the court. In support of

Harris, amici briefs were received from Legal Services of New Jersey, the Attorney General on behalf of the New Jersey Division of Consumer Affairs, the American Civil Liberties Union of New Jersey, the New Jersey Institute for Social Justice, New Jersey Citizen Action, the New Jersey Public Policy Research Institute, the National Association of Consumer Advocates, AARP, the Center For Responsible Lending, and Seton Hall School of Law Center for Social Justice. The United States Chamber of Commerce, the New Jersey Business and Industry Association, and the American Financial Services Association filed amicus briefs in support of Delta.

## II.

We address first the procedural posture of this matter. Because we have been asked by the Third Circuit to answer a discrete question of state law, our inquiry is limited. Under federal arbitration law, it is ordinarily the role of an arbitrator and not the courts to interpret ambiguous provisions of an arbitration agreement. *Green Tree Fin.Corp. v. Bazzle*, 539 *U.S.* 444, 451–53, 123 *S.Ct.* 2402, 2407, 156 *L.Ed.*2d 414, 422–23 (2003) (plurality opinion); *PacifiCare Health Sys., Inc. v. Book*, 538 *U.S.* 401, 406–07, 123 *S.Ct.* 1531, 1535–36, 155 *L.Ed.*2d 578, 584 (2003). That general rule is especially applicable where the arbitration agreement contains "sweeping language concerning the scope of the questions committed to arbitration." *Bazzle, supra*, 539 *U.S.* at 453, 123 *S.Ct.* at 2407, 156 *L.Ed.*2d at 423. Most of the disputed provisions in the instant arbitration agreement are, to some degree, ambiguous. To the extent that the unconscionability of those provisions ultimately turns on how the arbitrator resolves the ambiguities, we are unable to determine whether the provisions are, in fact, unconscionable.[2] For purposes of answering the question of state law posed by the Third Circuit, we address how

---

[2] The arbitration agreement covers any claims involving "the validity, enforceability or *scope* of this [arbitration] Agreement." (Emphasis added).

the ambiguous provisions, if interpreted and applied in a manner detrimental to Harris, could be unconscionable. In doing so, we identify general principles of New Jersey contract law that the Third Circuit and the arbitrator can then apply to the agreement.

### III.

In today's companion decision, *Muhammad v. County Bank of Rehoboth Beach,* 189 *N.J.* 1, 28, 912 *A.*2d 88, 104, 2006 *WL* 2273448 (2006), we recognized the basic premise that when a party to an arbitration agreement argues that the agreement is unconscionable and unenforceable, that claim is decided based on the same state law principles that apply to contracts generally. The Federal Arbitration Act (FAA), 9 *U.S.C.A.* §§ 1 to –16, expresses a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 *U.S.* 1, 24, 103 *S.Ct.* 927, 941, 74 *L.Ed.*2d 765, 785 (1983). New Jersey's public policy similarly favors enforcement of valid agreements to arbitrate. *See Martindale v. Sandvik, Inc.,* 173 *N.J.* 76, 83–86, 800 *A.*2d 872 (2002) (citing New Jersey's Arbitration Act, *N.J.S.A.* 2A:24–1 to –11). The FAA, however, permits courts to refuse enforcement of an arbitration agreement to the extent "such grounds ... exist at law or in equity for the revocation of any contract." 9 *U.S.C.A.* § 2. Generally recognized contract defenses, such as duress, fraud, and unconscionability, can justify judicial refusal to enforce an arbitration agreement. *Doctor's Assocs., Inc. v. Casarotto,* 517 *U.S.* 681, 686–87, 116 *S.Ct.* 1652, 1656, 134 *L.Ed.*2d 902, 908–09 (1996); *Muhammad, supra,* 189 *N.J.* at 12, 912 *A.*2d at 94; *Martindale, supra,* 173 *N.J.* at 85–86, 800 *A.*2d 872.

The defense of unconscionability, specifically, calls for a fact-sensitive analysis in each case, even when a contract of adhesion is involved. *Muhammad, supra,* 189 *N.J.* at 15–16, 912 *A.*2d at 97. This Court has recognized that contracts of adhesion necessarily involve indicia of procedural unconscionability. *Id.* at 15, 912 *A.*2d at 96. We have identified, therefore, four factors as

deserving of attention when a court is asked to declare a contract of adhesion unenforceable. *Rudbart v. N. Jersey Dist. Water Supply Comm'n,* 127 *N.J.* 344, 356, 605 *A.*2d 681, *cert. denied,* 506 *U.S.* 871, 113 *S.Ct.* 203, 121 *L.Ed.*2d 145 (1992).

> [I]n determining whether to enforce the terms of a contract of adhesion, [we] look[ ] not only to the take-it-or-leave-it nature or the standardized form of the document but also to [ (1) ] the subject matter of the contract, [ (2) ] the parties' relative bargaining positions, [ (3) ] the degree of economic compulsion motivating the "adhering" party, and [ (4) ] the public interests affected by the contract.
>
> [*Ibid.*]

The *Rudbart* factors focus on the procedural and substantive aspects of a contract of adhesion in order to determine whether the contract is so oppressive, *Martindale, supra,* 173 *N.J.* at 90, 800 *A.*2d 872, or inconsistent with the vindication of public policy, *Muhammad, supra,* 189 *N.J.* at 25, 912 *A.*2d at 102, that it would be unconscionable to permit its enforcement. Courts generally have applied a sliding-scale approach to determine overall unconscionability, considering the relative levels of both procedural and substantive unconscionability. *See Sitogum Holdings, Inc. v. Ropes,* 352 *N.J.Super.* 555, 565–66, 800 *A.*2d 915 (Ch.Div.2002); *see also Muhammad, supra,* 189 *N.J.* at 14 n. 2, 912 *A.*2d at 96 n. 2 (noting appropriateness of sliding-scale analysis for contracts of adhesion).

In this matter, Harris alleges certain facts surrounding her signing of the contract that suggest a high level of procedural unconscionability. We do not resolve those disputed facts, nor do we rely on them in deciding the unconscionability question before us. It is sufficient to note that the arbitration agreement is in a consumer contract of adhesion where Delta, as a financial institution, possessed superior bargaining power and was the more sophisticated party in the transaction. *Delta Funding Corp., supra,* 396 *F.Supp.*2d at 516. Although that level of procedural unconscionability does not, by itself, render the arbitration agreement unenforceable, it must be taken into account as we turn to

the "public interests affected by the contract." *Rudbart, supra,* 127 *N.J.* at 356, 605 *A.*2d 681.

## IV.

In addition to Harris's broad assertion that the arbitration agreement as a whole is unconscionable and unenforceable, an argument that we find unpersuasive for reasons explained *infra,* several discrete provisions of the agreement are alleged to raise unconscionability concerns because they have the effect of limiting the substantive statutory rights and remedies available to a consumer. Related to that assertion is the claim that it is unconscionable for an arbitration agreement to include a "cost-shifting" provision that allows an arbitrator unfettered discretion to allocate the entire cost of arbitration to a consumer. Because we find that the provisions relevant to those claims can be applied in a manner that is unconscionable and unenforceable under New Jersey law, we address them first in responding to the Third Circuit's inquiry.

### A. Hearing-level costs

The arbitration agreement states that "[a]t the conclusion of the arbitration, the arbitrator will decide who will ultimately be responsible for paying the filing, administrative and/or hearing fees in connection with the arbitration." It is beyond dispute that Harris would be entitled to costs if she prevailed on her CFA or TILA claims. An award of attorney's fees and costs to prevailing plaintiffs is mandatory under both statutes. *N.J.S.A.* 56:8–19; 15 *U.S.C.A.* § 1640(a)(3). If, however, Harris did not prevail in arbitration (or if she prevailed only on her RESPA claim and the arbitrator declined to make a discretionary award of costs as allowed under RESPA, 12 *U.S.C.A.* § 2607(d)(5)), then Harris could be forced to bear the entire cost of the arbitration.[3]

---

[3] Delta argues that if Harris brought her claim in the JAMS arbitration forum, the JAMS Policy on Consumer Arbitrations would shield her from incurring any

 It is well understood that fee-shifting provisions can deter a litigant from pursuing a claim. *See Dare v. Freefall Adventures, Inc.*, 349 *N.J.Super.* 205, 221–24, 793 *A.*2d 125 (App.Div.) (refusing to enforce mandatory fee-shifting provision against a recreational sports participant), *certif. denied*, 174 *N.J.* 43, 803 *A.*2d 638 (2002); *N.J. Coal. of Health Care Prof'ls, Inc. v. N.J. Dep't of Banking and Ins., Div. of Ins.*, 323 *N.J.Super.* 207, 263, 732 *A.*2d 1063 (App.Div.) (noting that "imposing counsel fees in favor of an insurance company may chill resort to the dispute resolution process"), *certif. denied*, 162 *N.J.* 485, 744 *A.*2d 1208 (1999). The prospect of having to shoulder all the costs of arbitration could chill Harris and similarly situated consumers from pursuing their statutory claims through mandatory arbitration.[4] Other courts that have analyzed the allocation of arbitration costs under federal law, have taken into consideration the possible " 'chilling effect' " that certain cost provisions can have both on an individual claimant and on similarly situated litigants. *Morrison v. Circuit City Stores, Inc.*, 317 *F.*3d 646, 657–67 (6th Cir.2003) (finding cost-splitting provision unenforceable); *see also Scovill v. WSYX/ABC, Sinclair Broad. Group, Inc.*, 425 *F.*3d 1012, 1019–21 (6th Cir.2005) (finding cost-shifting provision unenforceable under *Morrison* ).

 Although the public policy of our State would permit an arbitration agreement to shift costs and attorney's fees to a consumer who brings "frivolous" or "bad faith" claims, *see N.J.S.A.* 2A:15–59.1 (recognizing public policy against frivolous and bad faith litigation and establishing penalties for same), no such limitation is evident in the cost-shifting provision applicable

---

more than $125 in arbitration costs. The application and interpretation of the JAMS policy is for the arbitrator to decide.

[4] That said, the Appellate Division has enforced the customary provisions in mortgage notes that allow a lender, upon default, to recover from a borrower the costs of collection, including attorney's fees. *Hatch v. T & L Assocs.*, 319 *N.J.Super.* 644, 645, 647, 726 *A.*2d 308 (App.Div.1999). That situation is distinguishable from a contract in which a consumer asserting affirmative statutory claims may be required to bear the entire costs of arbitration.

to Harris. Delta claims that arbitrators rarely, if ever, shift costs to a consumer. However, contract unconscionability must be decided based on the contract as written because the language of the agreement is what consumers must consider when assessing whether to pursue a statutory-rights claim against Delta.[5] Delta drafted the arbitration agreement giving the arbitrator unfettered discretion to shift the entire cost of arbitration to Harris. The agreement as written, and as yet uninterpreted by an arbitrator, could force Harris to bear the risk that she will be required to pay all arbitration costs. That risk is unconscionable in that it is a deterrent to the vindication of her statutory rights.

The fact that, under the agreement's terms, Delta will consider, in "good faith," advancing any costs to Harris does not alter our analysis. Even if Delta elected to advance the costs of the arbitration to Harris, the advance is merely a loan. Harris ultimately could still be saddled with the entire cost of arbitration. That creates a substantial and unreasonable deterrent to the vindication of the statutory rights of Harris and others who are

---

[5] According to Delta, we need not scrutinize the cost provisions of the arbitration agreement because it has offered to pay all of Harris's arbitration costs, thereby mooting any potential cost issues. We find that argument unpersuasive. As the Sixth Circuit has explained,

[i]n considering the ability of plaintiffs to pay arbitration costs under an arbitration agreement, reviewing courts should not consider after-the-fact offers by employers to pay the plaintiff's share of the arbitration costs where the agreement itself provides that the plaintiff is liable, at least potentially, for arbitration fees and costs. The reason for this rule should be obvious. Our concern is that cost-splitting provisions will deter potential litigants from bringing their statutory claims in the arbitral forum. When the cost-splitting provision is in the arbitration agreement, potential litigants who read the arbitration agreement will discover that they will be liable, potentially, for fees if they bring their claim in the arbitral forum and thus may be deterred from doing so. Because the employer drafted the arbitration agreement, the employer is saddled with the consequences of the provision *as drafted*. If the provision, as drafted, would deter potential litigants, then it is unenforceable, regardless of whether, in a particular case, the employer agrees to pay a particular litigant's share of the fees and costs to avoid such a holding.

[*Morrison, supra,* 317 *F.*3d at 676–77.]

similarly situated. A contract of adhesion that contains such a term, which effectively would deter the vindication of a consumer's statutory rights, would be unconscionable and unenforceable if interpreted and applied in the manner described above.

### B. Attorney's fees

Harris's arbitration agreement states that "[u]nless inconsistent with applicable law, each party shall bear the expense of that party's attorneys', experts' and witness fees, regardless of which party prevails in the arbitration." " '[B]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral rather than a judicial, forum.' " *Martindale, supra*, 173 *N.J.* at 93, 800 *A.*2d 872 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 *U.S.* 614, 628, 105 *S.Ct.* 3346, 3354, 87 *L.Ed.*2d 444, 456 (1985)). Although this requirement has its genesis in federal arbitration law, it is equally applicable in determining unconscionability under New Jersey law. Just as defendants may not enforce exculpatory waivers that seek a release from a statutorily imposed duty, *McCarthy v. NASCAR, Inc.*, 48 *N.J.* 539, 543, 226 *A.*2d 713 (1967), defendants may not limit a consumer's ability to pursue the statutory remedy of attorney's fees and costs when it is available to prevailing parties. *See Muhammad, supra*, 189 *N.J.* at 19, 912 *A.*2d at 99 (finding class-arbitration bar that effectively acts as exculpatory waiver unconscionable).

The CFA and TILA provide mandatory attorney's fees and costs to prevailing parties. Plainly, those remedies are recoverable under Harris's arbitration agreement. On the other hand, under RESPA whether a prevailing party will be awarded attorney's fees and costs is discretionary. The arbitration agreement's clause that requires parties to bear their own fees and costs, no matter who prevails, "[u]nless inconsistent with applicable law," suggests that the arbitrator may not have the power to award attorney's fees when that statutory remedy is merely discretion-

ary.[6] The possibility of an award of fees to a prevailing party serves to encourage pursuit of RESPA's protections. To the extent that this provision in Harris's consumer contract would prevent her from recovering discretionary attorney's fees and costs under RESPA, it is unconscionable.

### C. Appeal costs

██ The arbitration agreement states that

if the amount in controversy exceeds $50,000, any party can appeal the award to a three-arbitrator panel administered by the same arbitration administrator which shall reconsider *de novo* any aspect of the initial award requested by the appealing party.... *The costs of such an appeal will be borne by the appealing party regardless of the outcome of the appeal.*

[ (Emphasis added).]

Like the attorney's fees provision discussed above, the appeals provision is unconscionable to the extent that it would bar Harris from being awarded costs if she prevailed on her appeal.[7] If Harris appeals and loses, she has no statutory entitlement to the remedy of costs. As such, the fact that the appeals provision requires her to bear her costs in that circumstance does not abridge Harris's substantive statutory remedies. To the extent that Harris would be required to incur the entire costs of taking an appeal, however, the appeals provision would be unconscionable. The same conclusion in respect of the unconscionability of the hearing-level costs provision applies to the allocation of costs related to appeals available within the arbitral forum.

### D. Post-interpretation by arbitrator

As noted, the arbitration provisions are subject to interpretation, but only by an arbitrator. Once that occurs, if the agreement

---

6 Under a different interpretation of this language, an arbitrator who refuses to consider granting a discretionary award of fees and costs to a party prevailing under RESPA would be acting "inconsistent with applicable law."

7 Delta counters that because the arbitration agreement requires the arbitrator to "apply applicable substantive law," the appeals cost provision does not bar an arbitrator from awarding Harris costs if she prevails on appeal.

is held to permit the shifting of arbitration costs to Harris, then the unconscionable cost-shifting provision must be severed from the agreement. In that eventuality, Delta, which previously offered to pay all of Harris's arbitration costs, would be responsible for the entire costs of arbitration. *Cf. Jones v. Household Realty Corp.*, No. C–3–03–280, 2003 WL 23750601, *5–6, 2003 *U.S. Dist. LEXIS* 25882 (S.D.Ohio Dec. 17, 2003) (slip op. at *16–18) (finding cost-splitting provision to be unconscionable and severing offending provision). In *Jones,* the court similarly ordered the defendant to pay "the entire cost of arbitration" based, in part, on the defendant's stipulated offer to pay such costs. *Id.* at *6, 2003 *U.S. Dist. LEXIS* at *17. Because a severance of the potentially cost-shifting provision from Harris's agreement will not result in a cost-splitting arrangement, we need not address whether a cost-splitting arrangement would be unconscionable. We do, however, note the concerns that courts have expressed over cost-splitting arrangements. *See Morrison, supra,* 317 *F.*3d at 657–67.

That said, if an arbitrator were to interpret all of the disputed provisions in a manner that would render them unconscionable, we have no doubt that those provisions could be severed and that the remainder of the arbitration agreement would be capable of enforcement. The arbitration agreement's broad severability clause supports that result.

## V.

Harris advances several other arguments in support of her claim of unconscionability. We dispense with those arguments, beginning with her criticism of the class-arbitration waiver, and then addressing her broad-based challenges that are, in our view, essentially attacks on the general nature of arbitration.

## A.

In respect of the arbitration agreement's class-arbitration waiver, we note initially that Harris is not even seeking to bring a class claim. Furthermore, under New Jersey law, the

class-arbitration waiver in her arbitration agreement is not unconscionable per se. In *Muhammad, supra,* we found a class-arbitration waiver unconscionable in the context of low-value consumer claims. 189 *N.J.* at 19–20, 912 *A.*2d at 99. *Muhammad* is distinguishable from the instant case, as Harris is seeking more than $100,000 in damages, and it is unclear whether that includes application of statutory multipliers. The plaintiff's potential damages in *Muhammad, supra,* including statutory damage multipliers, totaled less than $600 in a complicated matter. 189 *N.J.* at 21–22, 912 *A.*2d at 100. Harris's claim is not the type of low-value suit that would not be litigated absent the availability of a class proceeding. Harris has adequate incentive to bring her claim as an individual action. Not only are her damages substantial, but the fact that her home is at stake in the foreclosure proceeding makes it likely that she would contact an attorney. The same cannot be said of low-value claims where individuals have little, if any, incentive to seek out an attorney. Moreover, all of the statutes under which Harris seeks relief provide for attorney's fees and costs to prevailing plaintiffs. Those remedies, in combination with the substantial damages that Harris seeks, render the class-arbitration waiver enforceable in the context of this litigation. *See Muhammad, supra,* 189 *N.J.* at 21 n. 5, 912 *A.*2d at 100 (directing courts to consider the availability of attorney's fees when "substantial damages" are at stake).

## B.

The arbitration agreement excludes any foreclosure actions that may be brought against Harris. Thus, foreclosure must proceed in court pursuant to the arbitration agreement. Indeed, that is hardly surprising in that the foreclosure of mortgages is a uniquely judicial process. "The broad statutory framework set forth in *N.J.S.A.* 2A:50–1 to –68, establishes the basis for foreclosure of mortgages." *Highland Lakes Country Club & Cmty. Ass'n v. Franzino,* 186 *N.J.* 99, 106 n. 2, 892 *A.*2d 646 (2006); *see also R.* 4:64–1 to –8 (establishing rules specific to foreclosure

proceedings including *R.* 4:64–5's limitation on joinder of claims in foreclosure). Although Harris is able to raise potential defenses against Wells Fargo, the foreclosing party, in the foreclosure proceeding, as a result of the arbitration agreement she is forced to bring her third-party counterclaims against Delta in arbitration. Harris's defenses to the foreclosure action track her affirmative claims against Delta; thus, she is forced to litigate those substantively similar claims in two different forums. That result is burdensome; however, it is not unconscionable.[8]

Other courts that have found similar provisions not unconscionable have noted the unique nature of the judicial remedies of foreclosure and similar actions. *See Walther v. Sovereign Bank,* 386 *Md.* 412, 872 *A.*2d 735, 749 (2005) (stating that "foreclosure proceedings ... do not act solely to protect the interests of the mortgage lender against a defaulting debtor but instead provide protections for both sides."); *see also Conseco Fin. Servicing Corp. v. Wilder,* 47 *S.W.*3d 335, 343 (Ky.Ct.App.2001) (stating that claims involving security interests "have come to be heavily regulated by statute, allowing for streamlined procedures and effective protections for both sides.") (footnote omitted); *Lackey v. Green Tree Fin. Corp.,* 330 *S.C.* 388, 498 *S.E.*2d 898, 905 (S.C.Ct.App. 1998) (stating that "[j]udicial remedies for the recovery of property, such as the replevin action, and the foreclosure action, provide specific procedures for protection of collateral and the parties during the pendency of the proceedings. These protections relate to both parties, and are facilitated by the enforcement procedures specified in the law.") (footnote omitted). We acknowledge that

---

[8] The same conclusion was reached in *Cunningham v. Citigroup,* No. 05–3476, 2005 *WL* 3454312, *5–6, 2005 *U.S. Dist. LEXIS* 33805 (D.N.J. Dec. 16, 2005) (slip op. at *16). In a well-reasoned analysis, the court in *Cunningham* noted that because "the right to pursue a foreclosure action can only be done through the court system, [an arbitration agreement exempting foreclosure proceedings from arbitration] is more a practical recognition of the limitations of the arbital [sic] forum rather than an unconscionable provision [under New Jersey law]." *Ibid.*

contrary determinations have been reached by other courts. *See, e.g., Taylor v. Butler,* 142 *S.W.*3d 277, 284–87 (Tenn.2004), *cert. denied,* 543 *U.S.* 1147, 125 *S.Ct.* 1304, 161 *L.Ed.*2d 108 (2005); *Wis. Auto Title Loans, Inc. v. Jones,* 714 *N.W.*2d 155, 171–74 (Wis.2006).

Harris's burden of having to litigate in two forums is alleviated by the fact that attorney's fees and costs are available to Harris under the CFA if she successfully asserts CFA-based defenses in the foreclosure action. As the district court observed, the Appellate Division has stated that "for the purposes of eligibility for payment of reasonable attorneys' fees and costs, the [CFA] makes no distinction between a person who raises the Act's provisions in an affirmative claim and one who pleads it as a defense," *BJM Insulation & Constr., Inc.,* 287 *N.J.Super.* 513, 516, 671 *A.*2d 603 (App.Div.1996). Although we do not address whether attorney's fees and costs would be available in all contexts where the CFA is raised as a defense, we find the Appellate Division's analysis relevant here. Because of the arbitration clause, Harris is compelled to litigate essentially identical CFA claims in court and in arbitration. In that circumstance, Harris should, under *N.J.S.A.* 56:8–19, be eligible for attorney's fees and costs related to the foreclosure proceeding if she successfully asserts defenses based on the CFA in that proceeding.

### C.

Finally, we note Harris's argument that other clauses of the arbitration agreement are unconscionable, specifically the discovery and confidentiality provisions. She also contends that it is unconscionable for an arbitration agreement not to require a record of the proceedings or a reasoned and publicly available award. These claims are, at their core, a form of generalized attack on arbitration as a method of dispute resolution. As such, they are not persuasive.

Briefly, it is noteworthy that neither the arbitration agreement,[9] nor the rules of the potential arbitration administrators, prevent Harris from obtaining a record of the proceeding or a reasoned award. Both a written award and a record of the proceedings may be obtained upon request of one of the parties. Under the rules of the various administrators, the party seeking the written award or record may be required to pay for such request. Under our approach to costs outlined above, a question may arise as to the continued viability of the cost provisions related to written-award or record requests as applied against litigants such as Harris. Because it is unclear how the arbitrator will ultimately interpret the broad cost allocation provisions of the arbitration agreement, we need not address any specific cost provisions set out in the rules of various arbitration administrators at this time.

Finally, there is nothing in either the arbitration clause or the rules of the three arbitration administrators requiring that arbitration awards be kept confidential. It is not unconscionable to require that the proceedings before the arbitrator be kept confidential when the arbitrator's written award is not required to be kept confidential.

In conclusion, we add that to the extent that Harris advances other specific arguments in support of her claim of unconscionability, we reject those arguments, including her argument that the arbitration clause should be declared cumulatively unconscionable.

## VI.

In describing the arbitration provisions, the Court does not express a view on how an arbitrator will interpret the provisions. We intend only to answer the certified question of law before us based on the limited record presented. Our assumptions as to possible interpretations of the disputed contract terms were neces-

---

[9] The arbitration clause states that "at the timely request of either party, [the arbitrator] shall provide a brief written explanation of the basis for the award."

sary in order to address the unconscionability issues presented by the certified question.

Justice ZAZZALI, concurring in part and dissenting in part.

To the extent that the majority opinion strikes down certain provisions of the arbitration agreement as unconscionable, I concur. However, I disagree with the majority's conclusions regarding certain other provisions and would find them unconscionable. Additionally, even if I were to accept the majority's conclusions regarding the individual provisions, I nonetheless believe that the objectionable provisions cannot be severed from the agreement and that the agreement as a whole should be held cumulatively unconscionable. For those reasons, I respectfully dissent.

## I.

As Justice LaVecchia notes, this matter comes before the Court on a narrow question: "Is the arbitration agreement at issue, or any provision thereof, unconscionable under New Jersey law, and, if so, should such provision or provisions be severed?" 185 *N.J.* 255, 883 *A.*2d 1055 (2005). Because of our limited inquiry, the facts of the matter are neither controlling nor essential to my analysis. Nonetheless, they provide a context for the discussion, and therefore I will briefly recite them.

According to the certification of defendant Alberta Harris, at the time of the events in this matter, Harris was a seventy-eight year old widow living alone in her home in Newark. She has lived in that home for over thirty years and did not have a mortgage until she entered into the transaction that is the subject of this matter. Harris was educated only until the sixth grade, at which time she began working in Georgia cotton fields. Eventually, she moved north and worked in laundries pressing clothes and as a home health aide. She now lives on her monthly social security checks in the amount of $988. Out of that monthly payment, Harris must pay for heat, electricity, food, water, telephone ser-

vice, life insurance, and any necessary house repairs. Harris only has one relative living in the State, in Toms River.

Based on its 2005 annual Form 10–K, plaintiff Delta Funding Corporation (Delta) "is a national specialty consumer finance company that originates, securitizes and sells . . . non-conforming mortgage loans." According to the 10–K, Delta's

> loans primarily are secured by first mortgages on one- to four-family residential properties. Throughout our 24–year operating history, *we have focused on lending to individuals who generally do not satisfy the credit, documentation or other underwriting standards set by more traditional sources of mortgage credit,* including those entities that make loans in compliance with the conforming lending guidelines of Fannie Mae and Freddie Mac. We make mortgage loans to these borrowers for purposes such as debt consolidation, refinancing, education and home improvements.
>
> [Emphasis added.]

Delta states that, during 2005, its weighted average interest rate was eight percent. Delta has enjoyed considerable success and growth in the industry. Its 10–K reports that, "[f]or the year ended December 31, 2005, we originated $3.8 billion of loans, an increase of $1.2 billion, or 46.9%, over the $2.6 billion of loans originated in the year ended December 31, 2004."

The issue in this matter arises out of a loan entered into by Harris and Delta in 1999. According to her answer, counterclaim and third-party complaint, in December 1999, Kim Stewart of The Lending Source, Ltd. (Lending Source) contacted Harris and asked her if she needed money. Harris answered yes and explained that her income consisted of her monthly social security check and that, due to her financial situation, she only could afford a limited amount each month in payments. Stewart then arranged for a representative of Universal Window Products, Inc. (Universal) to come to Harris's house. Once at the house, the representative had Harris sign a contract to install fifteen windows and a door. That contract did not stipulate a price for the work.

After Harris signed the contract, a representative from Advanced Title Agency, Inc., apparently acting on behalf of Delta, came to her home at approximately 10 p.m. to have Harris sign

loan papers to cover the cost of the windows and door. Harris was sick in bed but was told by the representative that the loan papers had to be signed at that time. Harris also alleges that she was rushed when signing the papers because the representative was "running late." The loan entered into by Harris was in the amount of $37,700 with an annual interest rate of around fourteen percent and was secured by a mortgage on Harris's home. According to Harris's complaint, at least $11,000 of the loan went to Universal and $4,000 went to points, fees, and closing costs. Of that $4,000, Harris avers that almost $2,000 went to Lending Source. As a result of the loan, Harris became responsible for a $444.44 monthly payment to Delta.

Delta subsequently assigned the loan to Wells Fargo Bank (Wells Fargo) as trustee and, when Harris was unable to make the necessary payments, Wells Fargo initiated foreclosure proceedings on her home by filing a complaint in the Superior Court. In response, Harris filed an answer, counterclaim, and third-party complaint, naming, among others, Delta, Lending Source, Universal, and Advanced Title Agency. Harris raised three affirmative defenses and seven counterclaims, essentially arguing that the loan was unconscionable and unenforceable because it was made with the knowledge that Harris could not repay it and with the intent of allowing the lender to obtain her house. As per the terms of the arbitration agreement, Delta filed a petition in federal district court seeking to compel arbitration of the counterclaims. Harris then moved for summary judgment dismissing Delta's petition, and Delta cross-moved to compel arbitration. The district court granted Delta's motion, concluding that the arbitration agreement was not unconscionable. On appeal, the Third Circuit Court of Appeals asked this Court to resolve the instant question of law. 185 *N.J.* 255, 883 *A.*2d 1055 (2005).

## II.

As a general matter, the arbitration agreement at issue in this case has three major components. First, the agreement sets the

terms of arbitration through the "Resolution of Claims," "Hearing Location and Arbitration Costs," and "Federal Arbitration Act and Appeals" provisions. Second, through the "Excluded Claims" clause and accompanying definitions, the agreement explains that certain claims arising out of the transaction must be brought in arbitration while others must be brought in court, thereby creating a bifurcated claims structure. Third, the "No Class Actions, Etc." provision prohibits the arbitration of claims on a class action or class-wide basis. Apart from the definitions section, the only remaining provisions of the agreement are the severability clause, explaining that if one provision of the agreement is deemed unenforceable the other provisions continue in effect, and the "Important Additional Disclosures" provision, which explains that arbitration decisions are final.

In reaching its decision, the majority concludes that certain clauses of the "Hearing Location and Arbitration Costs" and "Federal Arbitration Act and Appeals" provisions are unconscionable; that the agreement's creation of a bifurcated structure for litigating claims arising out of the same transaction—although "burdensome" on borrowers, *ante* at 48, 912 *A.*2d at 116 is not in and of itself unconscionable; that although class action waivers can be unconscionable under our decision in *Muhammad v. County Bank of Rehoboth Beach,* 189 *N.J.* 1, 912 *A.*2d 88, 2006 WL 2273448 (2006), the provision in this case is not unconscionable; and, finally, that the objectionable provisions of the agreement are severable and the agreement itself is not cumulatively unconscionable. As stated, I agree with the majority in so far as it strikes down certain provisions as unconscionable. However, I also would find the provisions creating a bifurcated foreclosure structure and prohibiting class actions unconscionable. Moreover, even if I were to accept the majority's view of the individual provisions, I would nonetheless find that the objectionable provisions of the agreement cannot be severed and that, as a whole, the agreement should be held unconscionable.

III.

A.

In determining whether a contract is unconscionable, courts have focused on two factors: "(1) unfairness in the formation of the contract; and (2) excessively disproportionate terms." *Sitogum Holdings, Inc. v. Ropes,* 352 *N.J.Super.* 555, 564, 800 *A.2d* 915 (Ch.Div.2002). Those factors have been labeled "procedural" and "substantive" unconscionability. *Ibid.*

> The first factor—procedural unconscionability—can include a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process. The second factor—substantive unconscionability—simply suggests the exchange of obligations so one-sided as to shock the court's conscience.
>
> [*Id.* at 564–65, 800 *A.2d* 915 (citations omitted).]

Some courts have required that both factors be present for a finding of unconscionability, while other courts have found unconscionability based only on substantive unconscionability, and others still have used a "sliding scale" approach. *Id.* at 565–66, 800 *A.2d* 915.

As it pertains to contracts of adhesion, such as the arbitration agreement in this matter, this Court has identified four particularly relevant factors for determining unconscionability: "the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the 'adhering' party, and the public interests affected by the contract." *Rudbart v. N. Jersey Dist. Water Supply Comm'n,* 127 *N.J.* 344, 356, 605 *A.2d* 681, *cert. denied,* 506 *U.S.* 871, 113 *S.Ct.* 203, 121 *L.Ed.2d* 145 (1992). According to the majority, those "factors focus on the procedural and substantive aspects of a contract of adhesion in order to determine whether the contract is so oppressive or inconsistent with the vindication of public policy that it would be unconscionable to permit its enforcement." *Ante* at 40, 912 *A.2d* at 111 (internal citations omitted).

## B.

As the majority notes, at a minimum, "contracts of adhesion necessarily involve indicia of procedural unconscionability." *Id.* at 39, 912 *A*.2d at 111. The circumstances under which this matter comes before the Court—on a sparse record that consists of mere allegations—preclude the Court from properly examining whether other factors such as age, literacy, lack of sophistication, unfair bargaining tactics, or the particular setting of the contract formation affect the determination of procedural unconscionability. *See Sitogum, supra,* 352 *N.J.Super.* at 564, 800 *A*.2d 915. Suffice it to note that the allegations, if proven true, including the late night visit to Harris's home and the rushed nature of her signing the documents, could have a significant effect on future unconscionability determinations, such as whether the loan agreement itself is unconscionable.

However, some considerations of procedural unconscionability are still apparent on the record before us and are relevant to two of *Rudbart's* factors, namely, the parties' relative bargaining positions and the public interests affected by the contract. In that respect, it is significant that Delta is a subprime lender that, in its own words, "focuse[s] on lending to individuals who generally do not satisfy the credit, documentation or other underwriting standards set by more traditional sources of mortgage credit, including those entities that make loans in compliance with the conforming lending guidelines of Fannie Mae and Freddie Mac." Accordingly, in considering this arbitration agreement, we should not lose sight of the context in which Delta operates.

## C.

Turning to considerations of substantive unconscionability, I first disagree with the majority's holding that the excluded claims provision is not unconscionable. That provision, read in conjunction with the agreement's definitions of "Claim" and "Excluded Claims," as well as the opening paragraph of the agreement, creates a peculiar situation whereby certain claims arising out of

the transaction are litigated in arbitration while other claims, arising out of the same transaction, must be litigated in court.

The agreement begins by "set[ting] forth the circumstances and procedures under which Claims (as defined below) may be arbitrated instead of litigated in court." "Claim" is then defined as

> any claim, dispute or controversy between you and us (except for any Excluded Claims, as defined below) arising from or relating to the Credit Transaction or the relationships resulting from the Credit Transaction, including the validity, enforceability or scope of this Agreement, or the Credit Transaction. "Claim" includes claims of every kind and nature, including but not limited to initial claims, counterclaims, cross-claims and third-party claims and claims based upon contract, tort, fraud and other intentional torts, constitution, statute, regulation, common law and equity. The term "Claim" is to be given the broadest possible meaning and includes, by way of example and without limitation, any claim, dispute or controversy that arises under or relates to the Truth in Lending Act, the Home Owners and Equity Protection Act and Regulation Z (including any purported election to rescind the Credit Transaction); the Equal Credit Opportunity Act and Regulation B; the Real Estate Settlement Procedures Act and Regulation X; the Fair Credit Reporting Act; the Fair Debt Collection Practices Act; state insurance, usury and lending laws; fraud or misrepresentation, including claims for failing to disclose material facts; other federal or state consumer protection statutes or regulations; any party's execution of this Agreement and/or willingness to be bound by the terms of this Agreement; or any dispute about soliciting, originating, making, closing, servicing, collecting or enforcing the Credit Transaction.

However, the "Excluded Claims" provision then explains that "[n]otwithstanding the foregoing or any other term in this Agreement, Excluded Claims . . . are excluded from arbitration. This means that neither you nor us can require the other to arbitrate any Excluded Claims." Those claims that are excluded are:

> (a) any action to effect a judicial or non-judicial foreclosure or to establish a deficiency judgment; (b) any action arising out of unlawful detainer; (c) eviction or other summary proceeding to secure possession of real property securing the Credit Transaction; (d) any action to assert, collect, protect, realize upon or obtain possession of the collateral for the Credit Transaction in any bankruptcy proceeding; (e) any action to quiet title; (f) all rights of self-help including peaceful occupation of real property and collection of rents, set-off and peaceful possession of personal property; (g) obtaining a deed in lieu of foreclosure; (h) obtaining provisional or ancillary remedies in connection with the foregoing; (i) Claims that you or we individually filed in court before the effective date of this Agreement; and (j) Claims advanced in any judicial class actions that have been finally certified as class actions before the effective date of this Agreement.

The agreement attempts to clarify the above by providing:

> For example, if we were to commence a foreclosure action against you in court, that action and any defenses asserted by you in that action would be adjudicated in

court; however, if you asserted a counterclaim against us in that action which was covered by the scope of this Agreement, we would have the right to demand that the counterclaim be arbitrated (you would also have the right to arbitrate the counterclaim rather than asserting it in court).

Putting aside the question whether the above clauses are comprehensible—a debatable proposition—those provisions create a situation "so one-sided as to shock the ... conscience," *Sitogum, supra,* 352 *N.J.Super.* at 565, 800 *A.*2d 915; *see, e.g., Iberia Credit Bureau, Inc. v. Cingular Wireless L.L.C.,* 379 *F.*3d 159, 169–70 (5th Cir.2004) (holding, under Louisiana law, that arbitration provision requiring that any claim customer is likely to bring be raised in arbitration while allowing cellular telephone provider to raise its claims against customer in court unconscionable); *Wisconsin Auto Title Loans, Inc. v. Jones,* 714 *N.W.*2d 155, 173 (Wis.2006) (analyzing similar provisions and stating that "[w]hile we appreciate that a one-sided arbitration provision may not be unconscionable under the facts of all cases, we conclude that the overly one-sidedness of the arbitration provision at issue in the instant case renders the arbitration provision substantially unconscionable").

As the majority recognizes, the provisions are "burdensome," *ante* at 48, 912 *A.*2d at 116, because they require a borrower to litigate the foreclosure action and any claims permitted under the arbitration agreement in court while requiring certain other claims, arising out of the same transaction, to be brought in arbitration. *See Jones, supra,* 714 *N.W.*2d at 174 ("The possibility of dual forums for intertwined defenses and counterclaims imposes an unnecessary and undue burden on the borrower.... Uncontemplated inconvenience ... is a factor in deciding whether a clause is unconscionable." (citation omitted)). That leads to the incongruous result that a borrower defending against a foreclosure action will be forced to raise affirmative defenses in court but counterclaims, perhaps based on the same legal theory, in arbitration. In effect, by precluding counterclaims, the provision insulates Delta from damages in the court action. More important, the bifurcated process not only burdens the borrower but acts to

substantially preclude vindication of his or her rights. Indeed, as noted, Delta seeks out customers in financial straits, who are exactly the type of individuals who would find it difficult, if not entirely impossible, to litigate their claims in one forum, to say nothing of having to litigate simultaneously in two.

Finally, the majority's explanation that the provision is not unconscionable because a borrower may be able to obtain attorneys' fees if he or she successfully argues a New Jersey Consumer Fraud Act (CFA), *N.J.S.A.* 56:8–1 to –135, claim or defense is unpersuasive. The availability of attorneys' fees in this context places the proverbial cart before the horse because it does not remedy the burden of having to litigate one's rights in two forums. Rather, it provides relief to a borrower only *if* he or she proves a CFA claim or defense. As such, a borrower must gamble that he or she will not only prevail but also prevail under a CFA claim or defense and then be awarded attorneys' fees. I cannot understand how such a series of assumptions protects a borrower. Further, although the majority is correct in noting that foreclosure actions are properly commenced in court, that fact does not give Delta the right to exclude claims that it finds unfavorable from that court action by forcing them into arbitration. Nor does it lessen the burden that such a bifurcated claims resolution structure imposes on borrowers. Ultimately, I see no reason for the majority's conclusion and would strike this provision down as unconscionable.

## D.

The "No Class Actions, Etc." provision of the arbitration agreement prohibits borrowers from engaging in class actions or consolidated claims:

> There shall be no right or authority for any Claims to be arbitrated on a class action or class-wide basis. There shall be no right to arbitrate a claim as a representative of others or in a private attorney general capacity. Furthermore, Claims brought by or on behalf of other borrowers may not be consolidated with or arbitrated in any arbitration proceeding that is considering your Claims unless said other borrowers are parties to the same Credit Transaction. Similarly, you may

not join with other borrowers to bring Claims in the same arbitration proceeding unless all of the borrowers are parties to the same Credit Transaction.

This Court has explained the importance of class action lawsuits, stating that "[b]y permitting claimants to band together, class actions equalize adversaries and provide a procedure to remedy a wrong that might otherwise go unredressed." *In re Cadillac V8–6–4 Class Action,* 93 *N.J.* 412, 424, 461 *A.*2d 736 (1983). For example, one of the advantages of class action lawsuits is that they allow litigants with small claims to join together to litigate an action. *Id.* at 424–25, 461 *A.*2d 736. In our contemporaneous decision in *Muhammad, supra,* 189 *N.J.* at 22, 912 *A.*2d 101, we held that class action waivers are not per se objectionable but nonetheless invalidated the waiver in that appeal because it prohibited the joining together of small claims, thereby depriving individuals of their "statutory rights under this State's consumer protection laws." In the instant matter, the majority distinguishes *Muhammad* on the grounds that Harris is seeking $100,000 in damages, that she may be able to recover attorneys' fees, and that she has ample incentive to hire a lawyer in light of the fact that foreclosure proceedings have been initiated against her home.

I do not disagree with the majority that the facts of this matter are distinguishable from those in *Muhammad.* Rather, I simply find that the specific facts here are irrelevant to a proper resolution of the issue. As the majority notes, Harris is not seeking to bring a class action claim. *Ante* at 46, 912 *A.*2d at 115. Therefore, as I see it, the issue is not whether the class action waiver is unconscionable in this limited situation. Instead, the question is whether the class action waiver is unconscionable in the context in which Delta concededly conducts its business, that is, Delta's business model seeks out those who are in financial difficulty. It is precisely those types of individuals who would benefit from being able to enter into class action suits and minimize the expense of litigation. Further, although Harris is seeking $100,000 in damages, one can expect that the same issue will arise in the context of smaller claims that are in greater need of the benefits of class action litigation. Accordingly, as with the exclud-

ed claims provision, I would find the arbitration agreement's class action waiver unconscionable.

## IV.

Additionally, even if I were to accept the majority's conclusion that the excluded claims and class action provisions are not unconscionable, I nonetheless would find that the provisions the majority finds objectionable are not severable from the agreement and, in any event, that the arbitration agreement is so biased in favor of Delta that it is cumulatively unconscionable.

On the subject of severability, this Court has stated:

> If striking the illegal portion *defeats the primary purpose of the contract, we must deem the entire contract unenforceable.* However, if the illegal portion does not defeat the central purpose of the contract, we can sever it and enforce the rest of the contract.
>
> [*Jacob v. Norris, McLaughlin & Marcus,* 128 *N.J.* 10, 33, 607 *A.*2d 142 (1992) (emphasis added).]

Delta argues that the central purpose of the agreement is "arbitration which is both lawful and highly favored." I disagree. To maintain that the central purpose of the agreement is arbitration is to confuse the agreement's subject matter with its provisions. Indeed, the agreement does set up an arbitration proceeding. That much is obvious. However, it does so under rules and circumstances that are overwhelmingly beneficial to Delta, such as through the bifurcated foreclosure proceeding set up by the excluded claims provision. In other words, the purpose of the agreement is not merely to arbitrate claims; it is to arbitrate claims in a way that significantly advantages Delta at the expense of borrowers. In my view, the majority's striking down of various arbitration provisions is a sufficient basis for finding that the "primary purpose of the contract," *ibid.*, has been defeated, thereby compelling the conclusion that the entire agreement is unenforceable because the offending provisions cannot be severed.

Further, the fact that the primary purpose of the agreement is to significantly advantage Delta at the expense of borrowers supports the conclusion that the entire agreement should be held

cumulatively unconscionable. At a minimum, the majority has found that certain provisions relating to the rules of arbitration are unconscionable. Additionally, even if the excluded claims and class action waiver provisions are not unconscionable, as the majority finds, they are intended to provide a benefit to Delta at the expense of borrowers. Therefore, all three of the major components of the arbitration agreement are designed to benefit Delta. The only "advantage" to the borrower that I can find in the agreement is that it allows the borrower to choose which arbitration administrator to use. I conclude that such an arbitration agreement is "so one-sided," *Sitogum, supra,* 352 *N.J.Super.* at 565, 800 *A.*2d 915, that we should reject it in its entirety.

## V.

Although I agree with the majority's conclusions regarding certain provisions of the agreement, I also would find the excluded claims and class action waiver provisions unconscionable. Additionally, I would strike down the entire arbitration agreement on the grounds that the provisions found objectionable by the majority are not severable and that the agreement is cumulatively unconscionable. In these circumstances we must be mindful that "[l]aymen cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries." *Brotherhood of R.R. Trainmen v. Virginia,* 377 *U.S.* 1, 7, 84 *S.Ct.* 1113, 1117, 12 *L.Ed.*2d 89, 94 (1964).

Because I believe that this agreement exploits the individual and manipulates the process, I respectfully concur in part and dissent in part.

Justice RIVERA–SOTO, dissenting.

In this appeal we have been asked to "answer *a question of law* certified to [this Court] by the United States Court of Appeals for the Third Circuit...." *Rule* 2:12A–1 (emphasis supplied). That question, as modified, was: "Is the arbitration agreement at issue, or any provision thereof, unconscionable under New Jersey law,

and, if so, should such provision or provisions be severed?" *Delta Funding Corp. v. Harris,* 185 *N.J.* 255, 883 *A.*2d 1055 (2005). Stated succinctly, the question before us is whether the arbitration agreement here is unconscionable.

The majority enjoins at the outset that "the purpose of the certification process is to answer the question of law submitted pursuant to *Rule* 2:12A, not to resolve those factual differences [between the parties]. *See R.* 2:12A–1." *Ante,* 189 *N.J.* at 35, 912 *A.*2d at 108 (2006). However, by proceeding to analyze whether any provision of the arbitration agreement at issue is unconsciona-ble, the majority does not observe that injunction when it concedes that "the defense of unconscionability, specifically, calls for a fact-sensitive analysis in each case, even when a contract of adhesion is involved." *Ante,* 189 *N.J.* at 39, 912 *A.*2d at 111 (2006) (citation omitted). Instead, the majority engages in the resolution of facts in order to reach its conclusions that (1) "[t]he agreement as written, and as yet uninterpreted by an arbitrator, could force Harris to bear the risk that she will be required to pay all arbitration costs[, and that such] risk is unconscionable in that it is a deterrent to the vindication of her statutory rights[,]" *ante,* 189 *N.J.* at 43, 912 *A.*2d at 113 (2006); (2) "[t]o the extent that this provision [for prevailing party fee-shifting] in Harris's consumer contract of adhesion would prevent her from recovering discretion-ary attorney's fees and costs under [the Real Estate Settlement Procedures Act (RESPA) ], it is unconscionable[,]" *ante,* 189 *N.J.* at 45, 912 *A.*2d at 114 (2006); and (3) "the appeals provision [requiring the appealing party to bear all appeal costs regardless of outcome] is unconscionable to the extent that it would bar Harris from being awarded costs if she prevailed on her appeal." *Ante,* 189 *N.J.* at 45, 912 *A.*2d at 114 (2006).

Because *Rudbart* plainly instructs that unconscionability is a concept that draws breath only from specific facts, the better view is the one adopted by Judge Lifland of the United States District Court for the District of New Jersey, who denied Harris's motion

for summary judgment and granted Delta's cross-motion to compel arbitration, explaining that Harris's unconscionability claims require "a fact-sensitive analysis and must therefore be determined on a case-by-case basis." *Delta Funding Corp. v. Harris,* 396 *F.Supp.*2d 512, 516 (D.N.J.2004). Against that backdrop, Judge Lifland narrowed the issue to "[w]hether the Arbitration Agreement is an unenforceable contract of adhesion thus depends on whether it contains terms that are oppressive or unconscionable." *Id.* at 517.

In this certified question, I would not reach the merits of Harris's unconscionability claims. Therefore, in recognition of the limitation of *Rule* 2:12A–1, I would dismiss the certification of the question presented by the United States Court of Appeals for the Third Circuit as improvidently granted.

I respectfully dissent.

*For the judgment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA and WALLACE—4.

*For concurrence in part/dissent in part*—Justice ZAZZALI—1.

*For dissent*—Justice RIVERA–SOTO—1.

Not Participating—Justice ALBIN.