IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 6, 2008

Charles R. Fulbruge III
Clerk

No. 06-20138

DR JOE MORRISON; ET AL

                                        Plaintiffs

DR JOE MORRISON; DAWN MORRISON; RANDY COUNCILL; JANET COUNCILL;
DAN HIGGINS; HELEN HIGGINS; RON GREEN; KAREN GREEN; VICTOR
BROOK; CATHY BROOK; RICHMOND EAGLE CORP; DAVE ROBERTS; ROSE
ROBERTS; TONY CUTAIA; MARY CUTAIA; WARREN BIRD; DONNA BIRD;
KYE YEAMAN; WADE MCKAY; DEBBIE MCKAY; ROBERT PRICE; BARBARA
PRICE; CLAY YOUNG; LISA YOUNG

                                        Plaintiffs - Appellants

HERBERT HAMILTON; MARILYN HAMILTON; DONALD MAY; CELESTE MAY;
MICHAEL CUTAIA; KAREN CUTAIA; RANDALL LAINE; DIANE LAINE;
FRANK MAZZOLA; KAREN MAZZOLA; LARRY ROGERS; SUZANNE ROGERS;
ROBERT SCHMANSKI; DANA SCHMANSKI

                                        Appellants

versus

AMWAY CORPORATION; ET AL

                                        Defendants

AMWAY CORPORATION; DEXTER YAGER, INDIVIDUALLY, DOING BUSINESS AS
YAGER ENTERPRISES AND INTERNET SERVICES CORP; DONALD
R WILSON, INDIVIDUALLY, DOING BUSINESS AS WOW INTERNATIONAL INC;
RANDY HAUGEN, INDIVIDUALLY, DOING BUSINESS AS FREEDOM
ASSOCIATES INC; FREEDOM TOOLS INC; JOHN SIMS, INDIVIDUALLY,
DOING BUSINESS AS SIMS ENTERPRISES; INTERNET SERVICES CORP; YAGER
ENTERPRISES

                                        Defendants - Appellees

versus

PAMELA GALE JOHNSON, JOE & DAWN MORRISON BANKRUPTCY ESTATE;
WILLIAM G WEST, TONY & MARYANN CUTAIA BANKRUPTCY ESTATE;

ROBERT NEWHOUSE, HERBERT & MARILYN HAMILTON BANKRUPTCY ESTATE; HELEN G SCHWARTZ, WADE & DEBBIE MCKAY BANKRUPTCY ESTATE; CHRISTOPHER MOSER, WARREN & DONNA BIRD BANKRUPTCY ESTATE; WILLIAM G WEST, RANDY & JANET COUNCIL BANKRUPTCY ESTATE; BEN FLOYD, MICHAEL & KAREN CUTAIA BANKRUPTCY ESTATE; W STEVE SMITH, RON & KAREN GREEN BANKRUPTCY ESTATE; BEN FLOYD, FRANK & KAREN MAZZOLA BANKRUPTCY ESTATE; JANET CASCIATO-NORTHRUP, DAVE & ROSE ROBERTS BANKRUPTCY ESTATE; BEN FLOYD, DANA & ROBERT SCHMANSKI BANKRUPTCY ESTATE; JANET CASCIATO-NORTHRUP, DONALD AND CELESTE MAY BANKRUPTCY ESTATE

Trustees - Appellants

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before GARWOOD, SMITH, and DEMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

Appellants (collectively, "Distributors") appeal the district court's final judgment confirming and entering judgment on the arbitration award. Appellants seek reversal of the district court's judgment and vacatur of the arbitration award, reversal of the district court's prior order compelling arbitration, and remand for a trial. They argue five issues on appeal: (1) the district court erred by not vacating the arbitration award due to the arbitrator's evident partiality and bias; (2) the district court erred by compelling arbitration since the arbitration agreement was not valid and enforceable due to Amway's retention of a unilateral right to modify it; (3) the district court erred by compelling

2

arbitration since the arbitration agreement was unconscionable; (4) the district court erred by compelling arbitration even if the agreement was valid and enforceable because the arbitration agreement did not cover all of the Distributors' asserted claims; and (5) the district judge lacked jurisdiction to confirm the arbitration award.

**CONTEXT FACTS AND PROCEEDINGS**

The disputes comprising the core of this appeal have been in contention for more than ten years, and have been heard in several courts and other dispute resolution fora. Distributors' complaints center upon their relationships with appellee Amway Corporation and distributorships within Amway Corporation (collectively, "Amway"), a multinational seller of household products in existence since 1959. Amway distributes products by means of a vast network of independent distributors who, in turn, continuously recruit new distributors (also called "down-liners").[1] All distributors in this case were in the "down-line" of the distributor appellee Dexter Yager.

Based on their success selling products, distributors may earn entry into particular levels, with the Diamond level being among the highest levels of success. Many of the Distributors worked

---

[1] Each new distributor is in the "down-line" of the distributor who recruited him *and so on* all the way up the "down-line" to one of the relatively few distributors who is not in any other distributor's "down-line."

3

full-time as distributors, regarding Amway as their sole source of income.  Distributors earn their income based on commissions from their own sales and those generated by *their* down-liners.  In order to distribute Amway products, every Amway distributor signs Amway's standard distributorship agreement, which "confer[s] a right to distribute Amway products, and the right to receive sales commissions or 'bonuses' on any products sold, for a period of one year."  Among other things, the distributor agrees to pay an annual fee and to abide by Amway's Code of Ethics and Rules of Conduct "as amended and published from time to time in official Amway literature."  This agreement must be renewed annually, "no later than December 31 " for the following calendar year.  Many distributors renew automatically while others submit a renewal form each year entitled "Notice of Intent to Continue."  Business Support Materials (BSM) complement the Amway network, and consist of "rallies, tapes, books, and functions designed to motivate distributors."

In June 1997, according to the essentially undisputed showing in this respect of the Distributors, the disputes at the heart of this case, which had been festering for some time, came to a head.[2]

_____

[2] The Distributors' claims that later became subject to the January 13, 2005 arbitration award contested here include: disparagement and defamation; violation of the Texas Free Enterprise Act; violation of the Texas State Bribery Act; fraud; breach of contract (against Amway Corporation only); tortuous interference with current and prospective business relationships; conspiracy; "[i]mplied [b]reach of [i]mplied [c]ontract"; express and implied warranties;

4

Among other things, Distributors complained about how profits were determined regarding sales of BSM materials.

In September 1997, Amway informed Distributors it was amending the Rules of Conduct to include an arbitration program, communicating through publication in its official magazine, the *Amagram*, and other media sent directly to distributors. The arbitration provision, added to the 1998 Rules of Conduct, provided for arbitration for "any . . . claim or dispute arising out of or relating to [an] Amway distributorship, the Amway Sales and Marketing Plan, or the Amway Rules of Conduct (including any claim against another Amway distributor, or any such distributor's officers, directors, agents or employees, or against Amway Corporation, or any of its officers, directors, agents or employees)." The acknowledgment form mailed to the automatic renewal Distributors, containing information of the newly installed arbitration program, also stated, *inter alia*: "Because of some recent changes to the Intent to Continue (renewal) Form as well as the introduction of the new Business Support Material Arbitration Agreement (BSMAA), we need you to review the changes and sign the acknowledgment on the back of this letter. While these changes

---

intentional infliction of emotional distress; violation of Texas Deceptive Trade Practices Act; breach of fiduciary duty; and violation of Texas Business Opportunities Act. The Distributors prayed for compensatory damages in excess of $10,000,000.00 in addition to punitive damages, attorney fees and costs, pre- and post-judgment interest, treble damages as provided by statute, and any other relief to which they might be entitled.

automatically become part of your agreement with Amway, we wanted to make sure you are aware of them." The announcements also included a separate, optional BSM arbitration agreement. The parties disagree as to whether the Distributors needed to sign and return an "acknowledgment form" before October 3, 1997, in order to be considered subject to the arbitration agreement. There is no dispute that all Distributors renewed their distributorship agreements after Amway gave notice of implementation of the arbitration program.

On January 8, 1998, a group of Distributors (the Morrison group) sued Amway and other defendants (including Dexter Yager) in Texas state court alleging a number of federal and state law claims, ranging from defamation to RICO. Amway (and the other defendants) on February 6, 1998 timely removed the case to the district court under 28 U.S.C. § 1441(b), and then filed a motion to stay the suit pending arbitration. Distributors argued against the stay, contending, *inter alia*, that the Arbitration Agreement was not binding on them. On October 15, 1998, the district court granted Amway's motion and stayed the suit pending arbitration. *Morrison v. Amway Corp.*, 49 F. Supp. 2d 529 (S.D. Tex. 1998).[3]

---

[3] On December 8, 1998 the district court denied the Distributors' motion to certify its October 15, 1998 stay order for appeal under 28 U.S.C. § 1292(b). *See* 9 U.S.C. § 16(b)(1); *Terrebonne v. K-Sea Transp. Corp.*, 477 F.3d 271, 277 n.9 (5th Cir. 2007).

6

While all this transpired in federal district court, another group of Distributors (the Hamilton group), shortly after removal of the Morrison group's state suit, filed a state court action against Amway and other defendants with substantially similar state law claims as those of the Morrison group but lacking all the federal causes of action. Thereafter, on July 1, 1998, the Morrison group joined the Hamilton group in the second state suit. Amway moved in the state court to stay the proceedings in that suit pending arbitration pursuant to the arbitration agreement. Approximately one month after the federal district court stayed its proceedings, the state court stayed the state litigation pending arbitration of the Hamilton group's claims. The state court abated the Morrison group's claims because they were already *sub judice* in federal court, and the claims were subsequently dismissed for want of prosecution by the state court on October 23, 2003.

On May 18, 2001, the Distributors requested arbitration under the arbitration agreement. On June 14, 2001, Amway and other defendants filed counterclaims in the arbitration. On August 17, 2001, the Distributors filed a motion for "Summary Disposition" in the arbitration, contending, *inter alia*, that there was no valid agreement to arbitrate, that if there were such an agreement it did not apply, or could not properly apply, to disputes, such as those involved in the instant proceeding, which arose and were on-going and known to Amway prior to the September 1997 amendment to Amway

7

Rules of Conduct which introduced the arbitration program,[4] and, further, that the arbitration program "is inherently unfair" because Amway "selected and trained the arbitrators" and "hold[s] the exclusive power to remove unwanted" arbitrators. Amway and the other defendants filed a response and their own motion for summary disposition. On October 15, 2001, the arbitrator Anne Gifford denied (without explanation) both motions for summary disposition.

JAMS, the arbitration services provider for Amway, provided the parties with the names and biographical information of five neutrals "who had 'completed the training course for Arbitrators offered by [JAMS/Endispute], and conducted by Amway and the Amway Distributors Association[, ADA][5].'" From among those so listed, the parties ultimately selected Anne Gifford to arbitrate the dispute and she was appointed as Arbitrator June 14, 2001. On October 9, 2001, Gifford disclosed to the parties that she had attended a 1998 training session conducted by Amway and had subsequently conducted mediation training of certain Amway employees. Gifford held a teleconference with the parties where she invited any questions about her 1998 training. Following the teleconference, Gifford and

---

[4] And, "[o]nly after the possibility of litigation between the parties was obvious to both sides, did Amway unilaterally incorporate the arbitration clause in the distributors' renewals and acknowledgment forms."

[5] The Amway Distributors Association (ADA) is the nonprofit trade association of Amway distributors, and all Distributors were, it seems, voting members. However, Distributors contest this, claiming, "Nothing in the record shows Distributors ever had or exercised the right to vote on who would represent them on the ADA." No Distributor served on the ADA Board.

JAMS requested that any questions/objections concerning Gifford's service as arbitrator be raised by October 12, 2001. However, none were forthcoming from any party.

After allowing discovery, a three-week evidentiary hearing from January 5-24, 2004 in Houston, Texas, and post-hearing briefs, Gifford on January 13, 2005 ruled in favor of the Distributors on all of Amway's claims and in Amway's favor on all of Distributors' claims; fees and costs were awarded to each prevailing party, thereby resulting in an award of $7 million to Amway offset by an award to Distributors of $1 million.[6] The ruling (in common with all others in this arbitration) contains no analysis and states no reasons. Distributors on January 27, 2005 moved in the district court to vacate the award alleging, *inter alia*, Gifford's evident partiality and corruption as well as the unenforceability of the arbitration agreement. On March 31, 2005, Amway and the other defendants moved the district court to confirm the award and enter judgment on it. The district court, after a largely non-evidentiary hearing on May 20, 2005, allowed discovery on the matter of Gifford's alleged partiality, but on September 15, 2005, after filings by the parties as to the discovery results, ultimately

---

[6] On May 6, 2004, Gifford entered an interim award "on liability and damage eligibility" in which Amway and the other defendants prevailed as all the Distriburtors' claims against them and the Distributors prevailed on all counterclaims against them, and each set of parties was ruled entitled to attorneys' fees and costs. Thereafter, fee and cost bills were submitted; an interim award of fees and costs was made on January 5, 2005.

denied the motion to vacate and confirmed the award. Distributors moved for rehearing on September 21, 2005, which the district court denied without a hearing on October 4, 2005. Distributors thereafter timely filed their notice of appeal to this court.

## DISCUSSION

The Distributors assert, among other complaints on appeal, that the district court erred in its October 15, 1998 order staying their suit pending arbitration. The parties do not dispute the applicability of the Federal Arbitration Act. "This Court reviews de novo the grant or denial of a motion to compel arbitration." *Fleetwood Enterprises, Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002).[7]

In this respect, the Distributors contend, among other things, that the district court erred by compelling arbitration because an enforceable arbitration agreement never existed. There is no disagreement that there was a written arbitration policy in effect between the Distributors and Amway at the time the suit was filed. However, Distributors claim the arbitration agreement was not valid and enforceable for several reasons including the following. Distributors argue that the provision

---

[7] Under the circumstances here, the fact that after the stay order Distributors, under protest, commenced arbitration in which an award was made, does not of itself preclude or render moot their challenge to the district court's stay order, an order which was not previously appealable. *See* note 3 above and *Terrebonne v. K-Sea Transp. Corp.*, 477 F.3d 271, 279 n.9 (5th Cir. 2007). Appellees do not contend otherwise.

10

in the distributorship agreement that the distributor agreed "to comply with the Amway Sales and Marketing Plan, Code of Ethics, and Rules of Conduct as they are amended and published from time to time in official Amway literature," by virtue of which Amway in September 1997 amended its Rules of Conduct to for the first time include provisions for arbitration (which provisions Amway claims are applicable to disputes, such as those alleged in the instant lawsuit, which arose out of events occurring before the referenced September 1997 Rules of Conduct amendment), renders the arbitration agreement contained in the 1998 distributorship agreements illusory, lacking in consideration, and unenforceable. This, the Distributors assert, is because Amway, by virtue of its power to thus amend the Rules of Conduct, could unilaterally repeal or amend the arbitration provisions so that they were inapplicable even as to disputes, such as those here involved, of which Amway was aware and that arose out of events occurring prior to such an amendment.

The "federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Fleetwood Enterprises Inc.*, 280 F.3d at 1073. That determination "is generally made on the basis of 'ordinary state-law principles that govern the formation of contracts.'" *Id*. (quoting *First Options of Chicago Inc. v. Kaplan*, 115 S.Ct. 1920, 1924 (1995)). As did the district court,

11

49 F. Supp. 2d at 533-34, we make that determination based on Texas law, which is the law of the forum, there having been no showing that the law of any other arguably more appropriate state materially differs in respect to the present issue.

Every Distributor in entering his or her 1998 annual contract with Amway agreed

> "to conduct [his or her] business according to the Amway Code of Ethics and Rules of Conduct, as they are amended and published from time to time in official Amway literature. . . .
>
> I agree I will give notice in writing of any claim or dispute arising out of or relating to my Amway distributorship, or the Amway Sales and Marketing Plan or Rules of Conduct to the other party or parties . . . . I will then try in good faith to resolve the dispute using the Amway Conciliation and Enforcement Procedures contained in the Rules of Conduct for Amway Distributors. If the claim or dispute is not resolved to [his or her] satisfaction within 80 days, or after the Amway Conciliation process is complete, whichever is later, I agree to submit any remaining claim or dispute arising out of or relating to any Amway distributorship, the Amway Sales and Marketing Plan, or the Amway Rules of Conduct . . . to binding arbitration in accordance with the Amway Arbitration rules, which are set forth in the Amway Business Compendium."

There is no express exemption of the arbitration provisions from Amway's ability to unilaterally modify all rules, and the only express limitation on that unilateral right is published notice. While it is inferable that an amendment thus unilaterally made by Amway to the arbitration provision would not become effective until published, there is nothing to suggest that once published

12

the amendment would be inapplicable to disputes arising, or arising out of events occurring, *before* such publication.

In *In Re Halliburton Co.*, 80 S.W.3d 566 (Tex. 2002), an at-will employee sued his employer in 1999 claiming that his demotion during 1998 was based on race and age discrimination. In November 1997 the employer had sent all employees written notice that if they continued their employment after January 1, 1998, they would be governed by the arbitration "program" included with the notice. The Texas Supreme Court held that the employee, who had continued his employment past January 1, 1998, after receiving the notice in 1997, was required to arbitrate his claim against his employer. The employee asserted that the arbitration program was "illusory because the company retained the right to modify or discontinue" it. The Supreme Court rejected that contention stating:

> "'But the Program also provided that no amendment shall apply *to a Dispute of which the Sponsor* [Halliburton] *had actual notice on the date of amendment*.' As to termination, the plan stated that '*termination shall not be effective* until 10 days after reasonable notice of termination is given to Employees or *as to Disputes which arose prior to the date of termination*.' Therefore, Halliburton cannot avoid its promise to arbitrate by amending the provision or terminating it altogether. *Accordingly*, the provision is not illusory." *Id*. at 569-70 (emphasis added).

The Texas Supreme Court again addressed a similar issue in *J.M. Davidson Inc. v. Webster*, 128 S.W.3d 223 (Tex. 2003).

13

There, the at-will employee, Webster, was injured on the job in November 1998, filed a worker's compensation claim and shortly thereafter was terminated. He then sued his employer, Davidson, claiming his discharge was wrongful as being in retaliation for his filing the worker's compensation claim. Davidson claimed it was entitled to arbitrate pursuant to a written agreement Webster signed when he was hired by Davidson in December 1997. The first paragraph of the agreement dealt with arbitration; the second (and longer) paragraph largely dealt with a number of other employment related matters and stated in its next to last sentence that "The 'Company' reserves the right to unilaterally abolish or modify any personnel policy without prior notice." *Id*. at 226. The Supreme Court held that the contract was ambiguous with respect to whether the above quoted sentence of the second paragraph applied to the arbitration agreement contained in the first paragraph, and thus remanded the case to the trial court to resolve that ambiguity. *Id*. at 230-31. The court plainly held that *if* the defendant-employer retained the right to "unilaterally abolish or modify" the arbitration program, *then* the agreement to arbitrate was illusory and not binding on the plaintiff-employee.[8] The Court expressly

_____

[8] Eight of the nine justices agreed with this, although two were of the view that the agreement was not ambiguous in this respect and was illusory as a matter of law. One justice took the view that as a matter of law the agreement to arbitrate was not illusory.

14

distinguished *Halliburton* by noting that the contract there

"stated that any such amendment [to the arbitration program]

would apply prospectively only" and that "[t]he termination

provision in this case does not contain similar limitations."

*Id*. at 230.  The Court also stated that "most courts that have

considered this issue have held that if a party retains the

unilateral, unrestricted right to terminate the arbitration

agreement, it is illusory."  *Id*. at 230 n.2 (citing numerous

cases).[9]

Other Texas authorities are in accord.  *In Re C&H News Co*.,

133 S.W.3d 642 (Tex. App. – Corpus Christi 2003, no writ),

involved an employee's one page agreement stating he and the

---

[9]  Among the authorities so cited are the following:

"*Dumais v. Am. Golf Corp*., 299 F.3d 1216, 1219 (10th Cir. 2002) ("We join other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory."); *Floss v. Ryan's Family Steak Houses, Inc*., 211 F.3d 306, 315-16 (6th Cir. 2000) (arbitration agreement was 'fatally indefinite' and illusory because employer 'reserved the right to alter applicable rules and procedures without any obligation to notify, much less receive consent from,' other parties) . . . *Snow v. BE & K Constr. Co*., 126 F. Supp. 2d 5, 14-15 (D.Maine 2001) (citations omitted) (arbitration agreement illusory because employer 'reserve[d] the right to modify or discontinue [the arbitration] program at any time'; 'Defendant, who crafted the language of the booklet, was trying to "have its cake and eat it too."  Defendant wished to bind its employees to the terms of the booklet, while carving out an escape route that would enable the company to avoid the terms of the booklet if it later realized the booklet's terms no longer served its interests.'); *Trumbull v. Century Mktg. Corp*., 12 F. Supp. 2d 683, 686 (N.D. Ohio 1998) (no binding arbitration agreement because 'the plaintiff would be bound by all the terms of the handbook while defendant could simply revoke any term (including the arbitration clause) whenever it desired.  Without mutuality of obligation, a contract cannot be enforced.') . . . ."  *Id*.

15

employer have "agreed to submit all claims or disputes between us to binding arbitration as provided in the Handbook." The handbook, a separate document, provided that the employer reserved the unilateral right to amend it. The court concluded that arbitration agreement was "illusory" and "unenforceable" because the handbook allowed the employer to amend its terms and thus "to unilaterally amend the types of claims subject to arbitration." *Id*. at 647.

Amway relies on *In Re Advance PCS Health L.P.*, 172 S.W.3d 603 (Tex. 2003). There several pharmacies had entered into a Provider Agreement with Advance PCS health, a pharmacy benefits management company, to process and adjudicate claims for reimbursement between member pharmacies and customers' health care plans. The Provider Agreement contained an arbitration clause which PCS invoked when several of the pharmacies sued it asserting that PCS had for many years underpaid them what they were owed under the Provider Agreement. The pharmacies asserted that the arbitration agreement was illusory because the Provider Agreement allowed PCS to amend or cancel it at will. The court rejected that contention. It first observed that "[a]s the pharmacies' suit is based on that Agreement, they cannot enforce all of it except the arbitration clause" and that "[h]aving used PCS's services and network to obtain reimbursements for 10 years, the pharmacies cannot claim this agreement to arbitrate was

16

without consideration." *Id*. Here, by contrast, Amway seeks to enforce an arbitration agreement *with respect to* a dispute which arose, and concerns matters which occurred, *before* the arbitration provision was first introduced in September 1997; and the Distributors are not suing on the basis of any distributorship agreement which contains an arbitration clause. Further, in *Advance PCS* the court relied on the fact that the Provider Agreement not only stated that any amendments thereto made by PCS would not be effective prior to thirty days after notice thereof but also that with respect to termination "any obligations that arise prior to the termination of the Agreement shall survive such termination." *Id*. No such provision is present here. Moreover, nothing in *Advance PCS* suggests any intention to repudiate or narrow the then so recent *Davidson* opinion.[10]

---

[10] Nothing in *Re Dillard Dept. Stores, Inc.*, 198 S.W.3d 778 (Tex. 2006), is to the contrary. There, the plaintiff Garcia, while an employee of the defendant, was furnished in August 2000 a form agreeing to be bound by the employer's arbitration program also then furnished him. In 2002 Garcia was fired and then brought suit claiming the firing was illegal. The court held Garcia was bound by the arbitration agreement, rejecting her contention that it was illusory because the employer retained a right to unilaterally modify it. The court noted that no provision in the arbitration agreement purported to give the employer that right. *Id*. at 782. It further observed that although the employer in 2002 "draft[ed] a new arbitration policy" nothing in the record supported the view that the *new* policy – as opposed to that in effect since August 2000 – was applicable or sought to be applied to Garcia's claim. Here, by contrast, there *is* an express reservation by Amway of the right to change the rules, and the claims in question arose prior to any arbitration provision or notice thereof.

17

Here, the Distributors' suit, filed January 8, 1998, was not to any extent based on the 1998 distributorship agreement, which for the first time contained an arbitration clause, but rather asserted claims arising (and based on facts occurring) prior to September, when Amway unilaterally amended its rules of conduct to provide for arbitration. None of the distributorship agreements prior to that for 1998 contained anything about arbitration. *But* all the distributorship agreements, both those for 1997 and prior years *and* those for 1998 and subsequent years, contained the distributor's agreement to comply with Amway's Rules of Conduct as amended by Amway from time to time. That right of unilateral amendment extends to providing for (and, by necessary implication, to modifying or repealing) arbitration. This is made clear from the affidavit of David Bamborough, Amway's Manager of Business Administration, filed in the district court by Amway in support of its motion to stay pending arbitration. This affidavit states:

> "In September 1997, Amway Corporation, in consultation with the Amway Distributors Association "(ADA)", *amended the company's Rules of Conduct for its distributors to include an arbitration provision*, by which Amway and its distributors agree to submit to arbitration 'any . . . claim or dispute arising out of or relating to [an] Amway distributorship, the Amway Sales and Marketing Plan, or the Amway Rules of Conduct,' if good faith efforts within the organization failed to resolve the dispute. . . . This language

18

became effective for existing distributors January 1, 1998." (emphasis added).[11]

There is nothing in any of the relevant documents which precludes amendment to the arbitration program – made under Amway's unilateral authority to amend its Rules of Conduct – from eliminating the entire arbitration program or its applicability to certain claims or disputes so that once notice of such an amendment was published mandatory arbitration would no longer be available even as to disputes which had arisen and of which Amway had notice prior to the publication. There are no *Halliburton* type savings clauses which preclude application of such

---

[11] The affidavit goes on to state:

"When they first became distributors, each Plaintiff named in the present lawsuit signed an Amway Distributor Application, agreeing among other things to comply with Amway's Sales and Marketing Plan, Code of Ethics, and Rules of Conduct 'as they are amended and published from time to time in official Amway literature.' . . . in Order to continue as Amway distributors, each distributor is required to renew his or her distributorships at the first of every year, pay a renewal fee and renew the commitment to abide by the Amway Sales and Marketing Plan, Code of Ethics, and Rules of Conduct.
    . . . All Plaintiffs suing Amway have opted for 'automatic renewal,' by which their distributorships are continued automatically each yeaar (without the need to sign an annual renewal form each year) unless they notify Amway in writing to discontinue the automatic renewal process . . . .
    Seventeen Plaintiffs in this litigation at some point in the past signed Automatic Renewal Forms, which specifically reiterated their commitment 'to observe and abide by the . . . Rules of Conduct of Amway Distributors and all other rules, requirements, and regulations as they are set forth from time to time in official Amway literature.' . . .
    The remaining Plaintiffs sent in Automatic Renewal Forms, . . . which had the effect of renewing their pledges to conduct their distributorships in accordance with Amway's Rules of Conduct, Sales and Marketing Plan, and Code of Ethics."

amendments to disputes which arose (or of which Amway had notice) before the amendment.

We accordingly hold that the arbitration agreement was illusory and unenforceable under *Davidson* as applied to the claims asserted in the instant suit.[12]  We thus reverse the district court's October 15, 1998 order staying the case pending arbitration and its September 15, 2005 final judgment denying the Distributors' motion to vacate the award, granting Amway's motion to confirm the award, and entering judgment based upon the award; and we remand the case for further proceedings not inconsistent herewith.

REVERSED and REMANDED

---

[12]  It hence being unnecessary to do so, we do not address any other of the Distributors' issues on appeal.