NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5259-13T2

PAUL JAWORSKI, ALEXANDER
HAGGIS and ROBERT HOLEWINSKI,

    Plaintiffs-Appellants,

v.

ERNST & YOUNG US LLP, TRACEY
GUNTER and RICHARD BAKER,

    Defendants-Respondents.

_____

```
┌─────────────────────────┐
│  APPROVED FOR PUBLICATION │
│                          │
│      July 23, 2015       │
│                          │
│    APPELLATE DIVISION    │
└─────────────────────────┘
```

Argued February 23, 2015 — Decided July 23, 2015

Before Judges Lihotz, Espinosa and St. John.

On appeal from Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-5223-13.

Christopher P. Lenzo argued the cause for appellants (Lenzo & Reis, LLC, attorneys; Mr. Lenzo, of counsel and on the briefs).

Robert T. Szyba (Seyfarth Shaw LLP) argued the cause for respondents (Mr. Szyba and Loren Gesinsky (Seyfarth Shaw LLP), of the New York bar, admitted pro hac vice, attorneys; Mr. Szyba and Mr. Gesinsky, on the brief).

The opinion of the court was delivered by

ST. JOHN, J.A.D.

    Plaintiffs Paul Jaworski, Alexander Haggis and Robert

Holewinski appeal from the trial court's order compelling

arbitration of their age-discrimination suit against defendants Ernst & Young US LLP (EY) and two of its executives, Tracey Gunter and Richard Baker.  Plaintiffs challenge the enforceability of EY's mandatory arbitration policy on constitutional, statutory and common law grounds.  The employees were provided notice of changes to the arbitration policy by electronic distribution.  We must determine whether, if the policy states assent is given by continued employment, remaining employed with the company evinces an unmistakable indication that the employee affirmatively has agreed to arbitrate his claims pursuant to the changed policy.  Having reviewed the arguments advanced in light of the record and governing law, we affirm.

I.

The record discloses the following facts and procedural history.  Plaintiffs are former employees of EY's Secaucus office whose employment was terminated in August 2012.  Jaworski worked for EY for thirteen years and was a Finance Director in the Global Finance Group before his employment was terminated at the age of sixty-one.  Haggis was fifty-seven years old when EY terminated his employment after seventeen years, at which time he was a Manager of Accounting.  Holewinski worked at EY for over eleven years before he was fired, at age fifty-five, while

working as an Associate Director of Finance in the Global Infrastructure Group.

In August 2002, EY initiated the Common Ground Program (the Program), a set of mandatory alternative dispute resolution (ADR) procedures for its employees. The Program provided in pertinent part:

> All claims, controversies, or other disputes between [EY] and an Employee that could otherwise be resolved by a court, [subject to limited exceptions enumerated within] ("Covered Disputes"), shall be resolved through the Program, and both [EY] and the Employee expressly waive any right to resolve any Covered Dispute through any other means. <u>Neither [EY] nor an Employee will be able to sue in court in connection with a Covered Dispute</u>.
>
> [(Emphasis added).]

As a non-exhaustive list of examples of Covered Disputes within the Program's ambit, EY provided: (1) "[c]laims based on federal statutes" including civil rights and anti-discrimination laws; (2) "[c]laims based on state statutes and local ordinances including state and local anti-discrimination laws"; (3) "[c]laims based on common law theories such as tort and contract"; (4) "[c]laims concerning wages, salary and incentive compensation programs" subject to limited exceptions; and (5) "[c]laims concerning application, interpretation and enforcement of the Program." The provision further emphasized that "[a]ll

Covered Disputes, whether or not listed here, must be resolved through the Program."

In the event of a Covered Dispute, the Program first required "the parties . . . try to resolve the [dispute] through mediation" provided by the CPR Institute for Dispute Resolution (CPR). Should a dispute remain unresolved following mediation, either party was then able to proceed with binding arbitration, also through CPR. Any dispute for $250,000 or less was to be decided by one arbitrator, whereas any controversy involving more than $250,000, "or if the party initiating [arbitration] so chooses," went before a three-arbitrator panel. As to discovery, the program limited each party to one deposition pre-hearing, unless the arbitrator(s) found "the party seeking the [additional] discovery ha[d] a substantial need for it and . . . the discovery sought [was] consistent with the expedited nature of arbitration and not unduly burdensome."

In addition to requiring the initiating party to pay any filing fees as well as the party's own attorney's fees, the Program provided:

> The parties' intent is for the cost of the arbitration (including administration and arbitrator fees) to be shared equally to the extent permitted by law. However, the portion of the cost to be paid by an Employee shall be adjusted to the extent, if any, necessary for the parties' agreement to

arbitrate to be enforced in accordance with applicable law.

Finally, the ADR policy included a provision on Termination or Amendment of the Program:

> [EY] may propose termination or amendment of the program at any time by providing notice to Employees through the Daily Connection [daily email bulletin] or other electronic notice. <u>An Employee indicates his or her agreement to the proposed amendment or termination, and such proposed changes become effective as to that Employee, by continuing his or her employment with [EY] for at least three days after the notice is provided.</u> <u>Termination or amendment shall not affect a Covered Dispute as to which [mediation] has already been initiated</u>.

> [(Emphasis added).]

On July 29, 2002, EY announced the implementation of the Program to all United States (U.S.) personnel, including plaintiffs, via its Daily Connection email bulletin. The July 29 message provided a brief synopsis of the Program and directed the reader to two links, one leading to the policy's provisions in their entirety in EY's employee manual and the other to an article about the Program.

On March 23, 2006, EY announced revisions to the Program through a Daily Connection message to all U.S. employees, including plaintiffs. The three main changes, as identified in the email, were: (1) "Employees now have a choice of three ADR providers" — CPR, the American Arbitration Association (AAA) and

JAMS; (2) "[e]xcept for a fee equal to what it would have cost the employee to sue in court, the firm will pay the entire cost of mediation (not including any attorney's fees)"; and (3) "[d]isputes up to $1 million will be heard by a single arbitrator, rather than by a three-arbitrator panel."

The amendments also clarified certain important provisions through highlighting and italicization, unlike the 2002 version. For instance, under the 2006 Program, "*[n]either [EY] nor an employee will be able to sue in court in connection with a Covered Dispute.*" "*All Covered Disputes . . . must be resolved through the Program.*" Further, "*[a]n Employee indicates his or her agreement to the Program and is bound by its terms and conditions by beginning or continuing employment with [EY] after May 1, 2006* (the 'Effective Date')."

The 2006 amendments provided for expanded discovery, including a party's right to depose three individuals prior to any arbitration hearing. As to arbitration fees:

> 1. <u>Filing and administrative fees</u>. [EY] will pay all filing and administrative fees in connection with the arbitration, except as follows:
>
>> a. An Employee starting [arbitration] shall contribute the Court Equivalent Fee or the Employee's fee specified in the Arbitration Rules, whichever is less. An Employee who has paid the Court Equivalent Fee in

[mediation] need not contribute when initiating [arbitration].

. . . .

2. <u>Arbitrator fees and other costs</u>. The parties' intent is for the Arbitrator fees and other costs of the arbitration, other than filing and administrative fees, to be shared equally to the extent permitted by law and the Arbitration Rules. However, the portion of the cost to be paid by an Employee will be adjusted to the extent, if any, necessary for the parties' agreement to arbitrate to be enforced.

Finally, the 2006 policy amended the "Termination or Amendment" clause, so that:

[EY] may propose termination or amendment of the Program by providing notice to Employees through the Daily Connection or other electronic notice <u>on at least two occasions</u>. An Employee indicates his or her agreement to the proposed amendment or termination, and <u>such proposed change becomes effective as to that Employee, by continuing his or her employment with [EY] for at least thirty days after the second notice is provided</u>.

[(Emphasis added).]

However, as in the original policy, "[t]ermination or amendment will not affect a Covered Dispute as to which [mediation] had been initiated when the termination or amendment was proposed."

On April 25, 2006, EY sent the revised terms to all U.S. personnel via email. EY's records reflect that plaintiffs received the April 25 email.

On June 18, 2007, EY distributed another revised version of the Program via email to U.S. personnel, including plaintiffs. As with the previous iterations of the Program, an employee indicates agreement with its provisions by continuing employment with EY after the "Effective Date," in this case July 18, 2007. The main substantive difference between the 2006 and the 2007 versions is that under the latter an employee may only choose between AAA and JAMS, not CPR, for purposes of mediation and arbitration.

On August 3, 2007, Jaworski signed an EY Employment Agreement acknowledging and assenting to the terms of the Program. The last paragraph of the agreement states:

> I HAVE READ THIS AGREEMENT AND ATTACHMENT AND FULLY UNDERSTAND THEIR TERMS. I ACKNOWLEDGE THAT I HAVE AGREED TO WAIVE ANY RIGHT I MAY HAVE TO HAVE A DISPUTE BETWEEN MYSELF AND [EY] DETERMINED BY A COURT OF LAW AND THAT ALL SUCH DISPUTES SHALL BE RESOLVED THROUGH MEDIATION AND ARBITRATION.

On January 27, 2010, Haggis signed a similar contract agreeing to arbitration of any Covered Disputes. Holewinski, however, signed his Employment Agreement on May 19, 2004, but did not sign a new agreement after either the 2006 or 2007 amendments to the Program became effective. Nevertheless, Holewinski, Haggis and Jaworski all continued their employment with EY after July 18, 2007.

A-5259-13T2

Subsequent to their termination, plaintiffs filed the instant suit in the Law Division. In lieu of an answer, defendants moved to dismiss and compel arbitration, which plaintiffs opposed. The judge denied defendants' motion, concluding, although plaintiffs' claims fell within the meaning of Covered Disputes under the Program, because the record was "devoid of any indication that . . . plaintiffs signed any paperwork regarding the arbitration agreement," the Program was unenforceable as applied to them.[1] Defendants moved for reconsideration and, in support of their motion, attached copies of the three agreements signed by plaintiffs individually. Thereafter, the trial court granted defendants' motion for reconsideration and dismissed plaintiffs' claims without prejudice in favor of arbitration.

This appeal ensued.

## II.

We begin by noting the applicable legal principles that guide our analysis. Orders compelling or denying arbitration are deemed final and appealable as of right. See R. 2:2-3(a); Hirsch v. Amper Fin. Servs., LLC, 215 N.J. 174, 186 (2013). We exercise plenary review of the trial court's decision regarding

---

[1] The signed employment agreements referenced above were not included with defendants' initial filing.

the applicability and scope of an arbitration agreement.  See

Atalese v. U.S. Legal Servs. Grp., L.P., 219 N.J. 430, 446

(2014), cert. denied, 83 U.S.L.W. 3888 (U.S. June 8, 2015).

Similarly, the issue of whether parties have agreed to arbitrate

is a question of law that is reviewed de novo.  See Hirsch,

supra, 215 N.J. at 186; see also Manalapan Realty, L.P. v. Twp.

Comm. of Manalapan, 140 N.J. 366, 378 (1995) ("A trial court's

interpretation of the law and the legal consequences that flow

from established facts are not entitled to any special

deference.").  Nevertheless, "[i]n reviewing such orders, we are

mindful of the strong preference to enforce arbitration

agreements, both at the state and federal level."  Hirsch,

supra, 215 N.J. at 186.

### A.

We first must determine which iteration of the Program

controls as to each plaintiff's employment relationship with EY.

Jaworski and Haggis signed employment agreements on August 3,

2007, and January 27, 2010, respectively.  These agreements

unambiguously referenced and assented to the terms of the

Program, including the 2007 amendments, particularly with

regards to "WAIV[ING] ANY RIGHT [THE EMPLOYEE] MAY HAVE TO HAVE

A DISPUTE BETWEEN MYSELF AND [EY] DETERMINED BY A COURT OF LAW."

Jaworski's and Haggis' signatures constituted "explicit,

affirmative agreement[s] that unmistakably reflect[ed] the employee[s'] assent" to be bound by the 2007 amendments to the Program and arbitrate any employment-related disputes in lieu of proceeding in court. See Leodori v. Cigna Corp., 175 N.J. 293, 303, cert. denied, 540 U.S. 938, 124 S. Ct. 74, 157 L. Ed. 2d 250 (2003). Therefore, there can be no dispute they are each bound by its terms as in force as of each party's termination date.

However, Holewinski signed his employment agreement with EY in 2004, subsequent to the initial enactment of the Program in 2002, but before the later amendments. Relying on Leodori, he argues he cannot be forced to arbitrate under the policy in effect as of his termination date, because he never explicitly indicated his agreement thereto. Any attempt to compel arbitration, Holewinski submits, must be done under the original 2002 Program.[2] We disagree.

In Leodori, the Court declined to enforce an employment agreement's arbitration provision where there was no evidence the plaintiff-employee assented to the agreement's terms through his signature, and where there was no "other unmistakable

---

[2] Holewinski goes on to challenge the 2002 Program as unenforceable on other grounds, specifically, for failing to provide for a neutral arbitration forum. For the reasons that follow, we need not address this argument, which is limited solely to the Program in its original form.

A-5259-13T2

indication that the employee affirmatively had agreed to arbitrate his claims."  Leodori, supra, 175 N.J. at 306-07. However, in reaching its decision, the Court clarified, "'[t]o enforce a waiver-of-rights provision in this setting, the Court requires some concrete manifestation of the employee's intent as reflected in the text of the agreement itself.'"  Id. at 300 (alteration in original) (emphasis added) (quoting Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 135 (2001)).

Here, unlike Leodori, where the employer's "own documents contemplated [the employee]'s signature as a concrete manifestation of his assent," id. at 306,  EY's ADR policy provided: "*An Employee indicates his or her agreement to the Program and is bound by its terms and conditions by beginning or continuing employment with [EY] after July 18, 2007* (the 'Effective Date')."  Not only did Holewinski continue with EY after the Effective Date, thus manifesting his intent to be bound pursuant to the unambiguous and specifically-emphasized terms of the Program, he did so for an additional five years until his termination in 2012.  See Martindale v. Sandvik, Inc., 173 N.J. 76, 88-89 (2002) ("[I]n New Jersey, continued employment has been found to constitute sufficient consideration to support certain employment-related agreements." (citing

Quigley v. KPMG Peat Marwick, LLP, 330 N.J. Super. 252, 265 (App. Div.), certif. denied, 165 N.J. 527 (2000); Hogan v. Bergen Brunswig Corp., 153 N.J. Super. 37, 43 (App. Div. 1977))).[3]

Therefore, consistent with Leodori, we conclude Holewinski, Jaworski and Haggis are bound by the Program in its iteration as of the date of their termination.

B.

Plaintiffs challenge EY's mandatory ADR policy as unenforceable on several grounds. Specifically, they aver: (1) the Program constitutes an illusory agreement because EY retains the right to unilaterally modify its terms; (2) plaintiffs never agreed to arbitrate claims relating to the termination of their employment; (3) the Program is not a valid waiver of plaintiffs' constitutional and statutory rights to a jury trial; and (4) the Program is unconscionable since it imposes substantial forum

---

[3]  Moreover, although plaintiffs do not challenge the adequacy of the email notice of changes to the Program, we agree with those courts that have held "an e-mail, properly couched, can be an appropriate medium for forming an arbitration agreement." Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 555-56 (1st Cir. 2005) ("[W]e easily can envision circumstances in which a straightforward e-mail, explicitly delineating an arbitration agreement, would be appropriate."). EY's June 18, 2007 email to employees contained the Program's terms in their entirety, with special emphasis on those portions affecting employees' rights.

A-5259-13T2

costs on plaintiffs they would not incur if proceeding in a court of law.  We address each argument seriatim.

Plaintiffs first argue the Program constitutes an illusory promise because, given EY's right to modify or terminate, it impermissibly reserves the decision whether to resolve a particular employment-related dispute through mediation and arbitration to EY's sole discretion.[4]  Moreover, they contend the notice provision concerning when and how any amendments to EY's ADR policy take effect is functionally meaningless, because an employee has no means of rejecting a proposed amendment short of quitting his or her job.

As a general matter, both the Federal Arbitration Act (FAA), 9 U.S.C.A. §§ 1-16, and the New Jersey Arbitration Act (NJAA), N.J.S.A. 2A:23B-1 to -32, promote federal and state

---

[4]  Plaintiffs concede there is no controlling New Jersey precedent supporting this proposition, but rely upon a litany of decisions from other jurisdictions to contend EY's "unilateral reservation of the right to modify or terminate" the arbitration Program invalidates it.  See Morrison v. Amway Corp., 517 F.3d 248, 254-55 (5th Cir. 2008); Al-Safin v. Circuit City Stores, Inc., 394 F.3d 1254, 1259-60 (9th Cir. 2005); Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1179 (9th Cir. 2003), cert. denied, 540 U.S. 1160, 124 S. Ct. 1169, 157 L. Ed. 2d 1204 (2004); Floss v. Ryan's Family Steak Houses, Inc., 211 F.3d 306, 315-16 (6th Cir. 2000), cert. denied, 531 U.S. 1072, 121 S. Ct. 763, 148 L. Ed. 2d 664 (2001); Keanini v. United Healthcare Servs., Inc., 33 F. Supp. 3d 1191, 1195 (D. Haw. 2014); Phox v. Atriums Mgmt. Co., Inc., 230 F. Supp. 2d 1279, 1282-83 (D. Kan. 2002); Cheek v. United Healthcare of the Mid-Atl., Inc., 378 Md. 139, 161 (2003).

policies favoring arbitration as a means of resolving disputes by establishing the validity of arbitration provisions. See 9 U.S.C.A. § 2; N.J.S.A. 2A:23B-6. Section 2 of the FAA states such provisions "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," which the United States Supreme Court has interpreted as reflecting the "'fundamental principle that arbitration is a matter of contract.'" AT&T Mobility LLC v. Concepcion, 563 U.S. ___, ___, 131 S. Ct. 1740, 1745, 179 L. Ed. 2d 742, 751 (2011) (quoting Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 67, 130 S. Ct. 2772, 2776, 177 L. Ed. 2d 403, 410 (2010)); see also N.J.S.A. 2A:23B-6 (mirroring FAA's language).

Due to the preemptive effect of the FAA, a state may not invalidate an agreement to arbitrate on public-policy grounds or by defenses "'that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'" Atalese, supra, 219 N.J. at 441 (quoting Concepcion, supra, 563 U.S. at ___, 131 S. Ct. at 1746, 177 L. Ed. 2d at 751). However, "state courts remain free to decline to enforce an arbitration provision by invoking traditional legal doctrines governing the formation of a contract and its interpretation." NAACP of Camden Cnty. E. v. Foulke Mgmt. Corp., 421 N.J. Super.

404, 428 (App. Div.), <u>certif. granted</u>, 209 <u>N.J.</u> 96 (2011),
<u>appeal dismissed</u>, 213 <u>N.J.</u> 47 (2013).

Under general principles of contract law, an agreement,
including one to arbitrate disputes, based only upon an illusory
promise is unenforceable. <u>See</u> <u>Del Sontro v. Cendant Corp.</u>, 223
<u>F. Supp.</u> 2d 563, 578 (D.N.J. 2002) (citing <u>Bryant v. City of
Atl. City</u>, 309 <u>N.J. Super.</u> 596, 621 (App. Div. 1998)). "An
illusory promise has been defined as[] a 'promise which by [its]
terms make[s] performance entirely optional with the promisor
whatever may happen, or whatever course of conduct in other
respects he may pursue.'" <u>Bryant</u>, <u>supra</u>, 309 <u>N.J. Super.</u> at 620
(second and third alterations in original) (quoting <u>Restatement
(Second) of Contracts</u>, § 2 cmt. e (1979)) (internal quotations
marks omitted); <u>see also</u> <u>Customized Distribution Servs. v.
Zurich Ins. Co.</u>, 373 <u>N.J. Super.</u> 480, 493 (App. Div. 2004) ("An
illusory promise is defined as one 'in which the promisor does
not bind himself.'" (quoting <u>Black's Law Dictionary</u> 1213 (6th
ed. 1990))), <u>certif. denied</u>, 183 <u>N.J.</u> 214 (2005). Generally,
however, "courts should seek to avoid interpreting a contract
such that it is deemed illusory." <u>Bryant</u>, <u>supra</u>, 309 <u>N.J.
Super.</u> at 621 (citing <u>Russell v. Princeton Labs., Inc.</u>, 50 <u>N.J.</u>
30, 38 (1967); <u>Nolan v. Control Data Corp.</u>, 243 <u>N.J. Super.</u> 420,
431 (App. Div. 1990)).

Here, despite plaintiffs' suggestions otherwise, the Program was not founded on an illusory promise by EY to resolve any Covered Disputes through arbitration. The provision covering Termination or Amendment of the Program reads:

> [EY] may propose termination or amendment of the Program by providing notice to Employees through the Daily Connection or other electronic notice on at least two occasions. An Employee indicates his or her agreement to the proposed amendment or termination, and such proposed change becomes effective as to that Employee, by continuing his or her employment with [EY] for at least thirty days after the second notice is provided.
>
> [(Emphasis added).]

On its face, the provision provides if EY changes its arbitration policy, even in response to a previously-accrued claim, any change does not become binding on a particular employee until thirty days after he or she receives the second electronic notice of the amendment. Construing the Termination or Amendment clause's language as plaintiffs suggest would functionally read out the notice provision.[5]

---

[5] Plaintiffs' extra-jurisdictional authority, most of which is readily distinguishable, need not be addressed at length. See Morrison, supra, 517 F.3d at 256 (employer sought to retroactively apply ADR policy to facts pre-existing the proposal or adoption thereof); Al-Safin, supra, 394 F.3d at 1260 (employer argued amendment to ADR policy provided reasonable notice to former employees); Floss, supra, 211 F.3d at 315-16 (employer retained the "right to alter the applicable rules and procedures without any obligation to notify"); Keanini, supra,

(continued)

Moreover, plaintiffs erroneously seek to treat the language that "[t]ermination or amendment will not affect a Covered Dispute as to which [mediation] has been initiated when the termination or amendment was proposed" as exhaustive, so that the only disputes to which an amendment to the Program would not apply are those already in mediation at the time EY announced the change. No such exhaustiveness is explicit or even suggested in the language of that sentence itself or the surrounding provisions. Therefore, even if EY altered the Program before an employee initiated mediation for an accrued claim, that employee, pursuant to the explicit terms of the policy, would have thirty days to initiate before the proposed amendment altered his or her rights under the former language.

This reading of the notice provision does not render the language regarding the inapplicability of any termination or amendment to a Covered Dispute for which mediation has been

_____

(continued)
33 F. Supp. 3d at 1195 (ADR policy provided: "All arbitrations shall be conducted in accordance with the Policy in effect on the date [employer] receives the Demand for Arbitration" (emphasis added)); Phox, supra, 230 F. Supp. 2d at 1283 (employer reserved "the right to alter, amend, eliminate or modify [the arbitration] agreement prior to the initiation of any proceeding controlled or falling under the terms of th[e a]greement"); Cheek, supra, 378 Md. at 149 (employer retained "the right to alter, amend, modify, or revoke the . . . [p]olicy at its sole and absolute discretion at any time with or without notice").

initiated meaningless or superfluous. Rather, the latter clarifies that an employee who has already begun mediation need not take any additional action post-proposal of an amendment in order to preserve his or her rights under the status quo of the Program, pre-amendment.

In light of the principle that "courts should seek to avoid interpreting a contract such that it is deemed illusory," Bryant, supra, 309 N.J. Super. at 621, our construction of the Termination or Amendment clause provides a sound and equitable response to the parties' concerns. First, an employer is able to respond to developments in the law by adopting changes to its ADR policy without the prohibitively burdensome and costly obligation to negotiate the terms with each and every one of its employees. Indeed, we note that the facts of this case underscore the wisdom of endowing employers with such flexibility. Even a cursory review of EY's ADR policy, as it has developed since its initial enactment in 2002, demonstrates EY has repeatedly responded to positive developments in the law to amend its ADR procedures to provide greater, not fewer, protections for its employees in resolving employment-related disputes through ADR.

Equally important, employees need not fear that an employer may change the terms to retroactively alter an employee's

rights.  All an employee must do, pursuant to the unambiguous terms of the agreement, to ensure he or she can arbitrate under the terms in existence at the time of accrual is provide written notice to EY of the intention to mediate no later than thirty days after receiving the second electronic notice of a proposed amendment to or termination of the Program.  We therefore determine EY's ADR Program is not unenforceable as an illusory contract.

Plaintiffs next argue the trial court erred in dismissing their suit in favor of arbitration because they never agreed to arbitrate claims relating to the termination of their employment.  Relying on Garfinkel and Quigley, they contend EY's failure to include language relating to "discharge," "dismissal" or "termination" in defining what constitutes a Covered Dispute subject to mandatory arbitration removes plaintiffs' claims arising from termination from the Program's ambit.  We are not persuaded.

In Garfinkel, the Court concluded an arbitration provision, which stated "that 'any controversy or claim' that arises from the [employment] agreement or its breach shall be settled by arbitration," was "insufficient to constitute a waiver of [the] plaintiff's" statutory claims.  Garfinkel, supra, 168 N.J. at 134; see also Quigley, supra, 330 N.J. Super. at 272 (noting the

lack of any reference to statutory claims in arbitration clause). However, in providing guidance, the Court advised:

> "The better course would be the use of language reflecting that the employee, in fact, knows that other options such as federal and state administrative remedies and judicial remedies exist; that the employee also knows by [agreeing to] the contract, those remedies are forever precluded; and that, regardless of the nature of the employee's complaint, he or she knows that it can only be resolved by arbitration."
>
> [Garfinkel, supra, 168 N.J. at 135 (quoting Alamo Rent A Car, Inc. v. Galarza, 306 N.J. Super. 384, 394 (App. Div. 1997)).]

Plaintiffs contended their claims arose under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. Unlike the provisions in Garfinkel or Quigley, EY's Program explicitly states "[c]laims based on state statutes and local ordinances, including state and local anti-discrimination laws," are Covered Disputes. By specifically including state statutory anti-discrimination claims as Covered Disputes, EY clearly and unequivocally put plaintiffs on notice that any claims arising under the LAD, regarding termination or otherwise, were subject to mandatory arbitration. See also Atalese, supra, 219 N.J. at 444 ("No particular form of words is necessary to accomplish a clear and unambiguous waiver of rights.").

Plaintiffs next argue the ADR policy is not a valid waiver of their constitutional and statutory rights to a jury trial. They aver the decisions in Atalese and State v. Blann, 217 N.J. 517 (2014), when read in conjunction,

> stand for the proposition that when parties seek to arbitrate a claim that would otherwise be submitted to a jury, the arbitration agreement must inform the parties of (1) the number of jurors, (2) the parties' rights to choose the jurors, (3) how many jurors would have to agree on a verdict, and (4) who will decide the dispute instead of the jurors.

This argument is similarly unavailing.

In Atalese, the Court emphasized:

> [W]hen a contract contains a waiver of rights — whether in an arbitration or other clause — the waiver "must be clearly and unmistakably established." Thus, a "clause depriving a citizen of access to the courts should clearly state its purpose." We have repeatedly stated that "[t]he point is to assure that the parties know that in electing arbitration as the exclusive remedy, they are waiving their time-honored right to sue."
>
> [Atalese, supra, 219 N.J. at 444 (second alteration in original) (quoting Garfinkel, supra, 168 N.J. at 132).]

Unlike the arbitration clause struck down in Atalese, here, EY's written ADR policy unambiguously provides, with special emphasis through highlighting and italicization, "*[n]either [EY] nor an Employee will be able to sue in court in connection with*

*a Covered Dispute.*"  Therefore, the Program complies with Atalese and plaintiffs' arguments to the contrary are without merit.  Furthermore, we find plaintiffs' contention that Blann, which addressed the issue of when a criminal defendant's waiver of a jury trial was knowing and voluntary, see Blann, supra, 217 N.J. at 518, is applicable in resolving the present dispute to be without sufficient merit to warrant further discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Finally, plaintiffs contend the arbitration agreement is unconscionable because it exposes them to significant expenses related to the cost of paying arbitrators, which would not be incurred in a court of law.  Plaintiffs rely on several extra-jurisdictional decisions to argue cost-sharing provisions for arbitration expenses are invalid.  Additionally, plaintiffs point to a footnote in Atalese, where the Court noted that its opinion "should not be read to approve that part of the arbitration clause that states: 'The costs of arbitration, excluding legal fees, will be split equally or born by the losing party, as determined by the arbitrator.'"  Atalese, supra, 219 N.J. at 448 n.3.  Plaintiffs argue this statement implicitly invalidates EY's fee-sharing provision.

The Supreme Court has recognized that "the prospects of having to shoulder all the costs of arbitration could chill

. . . [plaintiffs] from pursuing their statutory claims through mandatory arbitration."  Delta Funding Corp. v. Harris, 189 N.J. 28, 42 (2006).  In Delta Funding, the Court invalidated an arbitration cost-shifting provision that potentially "could force [the plaintiff-consumer] to bear the risk that she will be required to pay all arbitration costs" as an unconscionable "deterrent to the vindication of her statutory rights."  Id. at 43.  In Atalese, the Court again expressed its displeasure with terms that potentially shift the entire cost of arbitration to the losing party.  See Atalese, supra, 219 N.J. at 448 n.3.

However, both Delta Funding and Atalese are distinguishable.[6]  Here, unlike those matters, EY's fee-sharing provision does not provide for the potential shifting of the entire cost of arbitrating to a non-prevailing employee. Rather, the provision states: "The parties' intent is for Arbitrator fees and other costs of the arbitration . . . to be shared equally to the extent permitted by law and the Arbitration Rules."  Any portion an employee might pay towards arbitration costs is to be limited by substantive law and

---

[6]   Alexander v. Anthony International, L.P., 341 F.3d 256 (3d Cir. 2003), upon which plaintiffs also rely, is similarly distinguishable.  See id. at 267-68 (invalidating fee provision requiring losing party to "bear the costs of the arbitrator's fees and expenses").

arbitration rules.[7]  There is no language suggesting employees would have to shoulder the entire pecuniary burden of the arbitration process.  Therefore, we determine EY's fee-sharing provision does not render its ADR policy unconscionable.[8]

For these reasons, we conclude EY's ADR policy, as reflected in the 2007 iteration of its Program, is valid and enforceable as to plaintiffs, and hold the trial court properly dismissed the complaint in favor of mandatory arbitration.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[7]  Both AAA's and JAMS' rules governing arbitration of employment-related disputes limit an employee's financial burden to the initial filing fee, with the employer being responsible for the balance of the costs.  See American Arbitration Association, Employment Arbitration Rules & Mediation Procedures 1-2 (Nov. 1, 2014), available at https://www.adr.org/aaa/ShowPDF?doc=ADRSTAGE2025292; JAMS, Employment Arbitration Rules & Procedures 26 (July 1, 2014), available at http://www.jamsadr.com/files/Uploads/Documents/JAMS-Rules/JAMS_employment_arbitration_rules-2014.pdf.

[8]  Furthermore, even if the fee-sharing provision was unconscionable, which we hold it is not, the Program contains a clause providing for broad severability in the event any portion of its terms is found unenforceable.  See Delta Funding, supra 189 N.J. at 46 ("[I]f an arbitrator were to interpret all of the disputed provisions in a manner that would render them unconscionable, we have no doubt that those provisions could be severed [in light of the arbitration policy's broad severability clause] and that the remainder of the arbitration agreement would be capable of enforcement.").